## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| *Plaintiff*, | : | |
| | : | Case No. 3:21-cv-64 |
| v. | : | |
| WYNN COGGINS, in her official capacity as Acting Secretary of Commerce; U.S. DEPARTMENT OF COMMERCE; RON S. JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; and U.S. CENSUS BUREAU, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

---

## THE STATE OF OHIO'S COMBINED MOTION FOR A PRELIMINARY INJUNCTION, PETITION FOR A WRIT OF MANDAMUS, AND MEMORANDUM IN SUPPORT OF THE COMBINED MOTION AND PETITION

---

The Census Bureau, in its "February 12 Decision," announced that the Acting Secretary of Commerce would not comply with her obligation, under 13 U.S.C. §141(c), to provide the States with redistricting data on or before March 31, 2021. *See* Press Release: Census Bureau Statement on Redistricting Data Timeline, UNITED STATES CENSUS BUREAU (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html (Ex. 1 of Complt.); James Whitehorne, *Timeline for Releasing Redistricting Data*, UNITED STATES CENSUS BUREAU (Feb. 12, 2021), https://www.census.gov/newsroom/blogs/random-samplings/2021/02/timeline-redistricting-data.html (Ex. 2 of Complt.).

The State of Ohio moves under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining the defendants from enforcing the "February 12 Decision." The State additionally, and in the alternative, petitions under 28 U.S.C. §1361 for a writ of mandamus ordering the Acting Secretary to comply with her statutory obligation to provide the State with redistricting data under 13 U.S.C. §141(c) by March 31, 2021.

Because of the impending deadline, Ohio requests a ruling on this motion by **March 10, 2021.**

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
Solicitor General
  *Counsel of Record
BENJAMIN M. FLOWERS*
Solicitor General
MAY DAVIS (*PHV application pending*)
Deputy Solicitor General
BRIDGET C. COONTZ
Section Chief, Constitutional Offices
JULIE M. PFEIFFER
Assistant Section Chief, Constitutional Offices
30 East Broad Street, 17th Floor
6l4-466-8980
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

2

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS....................................................................................i

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ........................................................................................ 1

BACKGROUND............................................................................................ 3

LEGAL STANDARD.................................................................................... 8

ARGUMENT ................................................................................................. 8

I.     The State of Ohio is entitled to an injunction requiring the Secretary to fulfill her statutory obligations under the Census Act. .......................... 9

Ohio is entitled to an injunction of the February 12 Decision because the State has satisfied all four of the preliminary-injunction factors.

A.     Ohio will prevail on the merits of its challenge. ..................................... 9

1.     The February 12 Decision violates the Census Act. .......................... 9

Every ten years, States redraw congressional and state-legislative maps in response to changes in population. The Census Act requires that the Secretary of Commerce provide the States with data that helps enable the drawing of these maps. Relevant here, the Census Act requires the Secretary of Commerce to give each State redistricting data by no later than March 31 of the year following the census. 13 U.S.C. §141(c). Thus, every State is entitled to receive the data by March 31. Nonetheless, in its "February 12 Decision," the Census Bureau—a bureau within the Department of Commerce and overseen by the Secretary of Commerce—finalized a plan to release data not in compliance with the March 31 deadline. Instead, the Bureau announced that the States would receive the data by September 30, 2021. Because the Decision flouts the Secretary's legal obligation to provide the data by March 31, 2021, it is *ultra vires* and should be enjoined. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173, (D.C. Cir. 2003).

2.    The February 12 Decision violates the Administrative
      Procedure Act. ................................................................................ 14

The February 12 Decision also violates the Administrative Proce-
dure Act. The "APA" requires courts to set aside "final agency ac-
tion[s]" that are "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The
February 12 decision is a "final agency action," not a tentative pre-
diction, and thus subject to the APA. *Berry v. Dep't of Labor*, 832
F. 3d 627, 633 (6th Cir. 2016). And the Decision violates the APA
for two separate reasons. *First*, because it violates the March 31
deadline imposed by 13 U.S.C. §141(c), it is "not in accordance with
law." §706(2)(A). *Second*, the decision is "arbitrary and capri-
cious." *Id*. An agency action is arbitrary and capricious if the agen-
cy "entirely failed to consider an important aspect of the problem,
offered an explanation for its decision that runs counter to the evi-
dence before the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise."
*Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29, 43 (1983). The defendants failed to engage in the required
analysis. While they recognized that some States needed the data
before others, the February 12 Decision states that it will release
*all fifty States'* data at once. This is a departure from past practice,
where the Census Bureau released data on a rolling basis. In set-
tling on this new approach, the agency did not consider alterna-
tives—such as a rolling release that prioritizes releases to States
that need the data soonest—that would have ameliorated the diffi-
culty. Nor is there any indication that it adequately considered the
degree to which the States had come to rely on the March 31 due
date. The failure to consider reliance interests, together with the
failure to consider meaningful alternatives, is arbitrary and capri-
cious. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.
Ct. 1891, 1915 (2020).

B.    Ohio will be irreparably harmed without an injunction. ...................... 19

The State will be irreparably harmed if the February 12 Decision is
not enjoined. The Ohio Constitution *requires* the Ohio Redistrict-
ing Commission and the General Assembly to use census data
when redistricting if that data is available. Ohio Const., art. XI,
§3(A); art. XIX, §2(A)(2). But the Ohio Constitution also requires
the Ohio Redistricting Commission to finalize its map by Septem-
ber 1 and to hold three public hearings before doing so. Ohio
Const., art. XI, §1. And if the General Assembly does not pass a
map with strong bipartisan support before September 30, the pow-

er to do so shifts to the Commission. *Id.*, art. XIX, §1. Thus, the State can simultaneously effectuate the preference for the use of census data and the constitutional deadlines *only if* the Census Bureau provides the State with data well in advance of the deadlines. The February 12 Decision, by delaying the release of data, thus keeps the State "from effectuating" state law, which constitutes irreparable harm as a matter of law. *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020).

C.     Enjoining the February 12 Decision will not cause substantial harm to others. ................................................................................... 23

An injunction here will not cause substantial harm to others. To the contrary, States around the Union will benefit from an order requiring the Secretary to do her job. While the defendants may have to expend resources to comply with any injunction, "injuries, however substantial, in terms of money, time and energy necessarily expended in compliance with an injunction are not enough" to defeat a request for injunctive relief. *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (quotation omitted). In any event, because the State will be irreparably harmed without an injunction, any harm to others is non-dispositive. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)). And the court can limit any potential harm to others by tailoring its injunction to provide only the relief that is strictly necessary.

D.     Enjoining the February 12 Decision will serve the public interest. ...... 24

Because the "public interest lies in a correct application of the" law, and "upon the will of the people … being effected in accordance with [the] law," *Coal. to Defend Affirmative Action*, 473 F.3d at 252, an injunction will further the public interest: it will ensure that the defendants follow federal law, and allow the State to best effectuate state law.

II.    If the Court determines that it may not issue an injunction, it should issue a writ of mandamus ordering the Secretary to comply with 13 U.S.C. §141(c) .............................................................................................. 24

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

iii

United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361.  Here, it would be appropriate to award mandamus relief requiring the Acting Secretary to comply with §141(c) if injunctive relief is not available.  If injunctive relief is determined to be unavailable, the State will have "exhausted all other avenues of relief" for enforcing "a clear nondiscretionary duty" that the Acting Secretary owes to it.  *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *accord Haddad v. EEOC*, No. 18-1034, 2019 U.S. App. LEXIS 13600, at *3 (6th Cir. May 6, 2019).  And because a writ would help prevent irreparable harm to the State, it would be "appropriate under the circumstances."  *Cheney v. United States Dist. Court*, 542 U.S. 367, 381 (2004).

CONCLUSION ........................................................................................... 26

CERTIFICATE OF SERVICE .................................................................... 27

iv

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) .......................................................................... 13

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ...................................................................... 21

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
  321 F.3d 1166 (D.C. Cir. 2003).......................................................... 13

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ............................................................................ 12

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ............................................................................ 8

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .......................................................................... 12

*Barry v. Lyon,*
  No. 13-cv-13185, 2015 U.S. Dist. LEXIS 174347 (E.D. Mich. June 5,
  2015)................................................................................................. 12

*Berry v. Dep't of Labor,*
  832 F. 3d 627 (6th Cir. 2016) ............................................... 14, 15, 16

*Cheney v. United States Dist. Court,*
  542 U.S. 367 (2004) ...................................................................... 8, 25

*City of Pontiac Retired Emples. Ass'n v. Schimmel,*
  751 F.3d 427 (6th Cir. 2014) .............................................................. 8

*CNSP, Inc. v. City of Santa Fe,*
  755 F. App'x 845 (10th Cir. 2019) ..................................................... 13

*Coal. to Defend Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006) ....................................................... 23, 24

*Cook v. FDA,*
  733 F.3d 1 (D.C. Cir. 2013) .............................................................. 11

*Crawford v. Marion Cty. Election Bd.,*
  553 U.S. 181 (2008) .......................................................................... 22

*Cyan, Inc. v. Beaver Cty. Emples. Ret. Fund,*
    138 S. Ct. 1061 (2018) ...................................................................................... 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................................................ 18, 19

*Dept. of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ........................................................................................ 6

*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016) ........................................................................................ 5

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .......................................................................................... 14

*Haddad v. EEOC,*
    No. 18-1034, 2019 U.S. App. LEXIS 13600 (6th Cir. May 6, 2019) ................. 8, 25

*Heckler v. Ringer,*
    466 U.S. 602 (1984) ...................................................................................... 8, 25

*Hosseini v. Johnson,*
    826 F.3d 354 (6th Cir. 2016) ............................................................................ 16

*Householder v. Ohio A. Philip Randolph Inst.,*
    140 S. Ct. 101 (2019) ....................................................................................... 22

*Int'l Refugee Assistance Project v. Trump,*
    883 F.3d 233 (4th Cir. 2018) (*en banc*) ............................................................ 12

*Jama v. Dep't of Homeland Sec.,*
    760 F.3d 490 (6th Cir. 2014) .................................................................. 14, 15, 16

*Lansing Dairy, Inc. v. Espy,*
    39 F.3d 1339 (6th Cir. 1994) ............................................................................ 17

*Lopez v. Davis,*
    531 U.S. 230 (2001) .......................................................................................... 11

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ................................................................................ 10, 11

*Maryland v. King,*
    133 S. Ct. 1 (2012) ...................................................................................... 21, 22

*Mays v. LaRose,*
    951 F.3d 775 (6th Cir. 2020) ............................................................................ 22

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019) ........................................................ 13

*Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................. 17, 18, 19

*New York v. Dep't of Commerce*,
  315 F. Supp. 3d 766 (S.D.N.Y. 2018) ................................... 10

*Ohio Democratic Party v. Husted*,
  834 F.3d 620 (6th Cir. 2016) ............................................ 22

*Roman Catholic Diocese v. Cuomo*,
  141 S. Ct. 63 (2020) ........................................................ 2

*Ross v. Nat'l Urban League*,
  141 S. Ct. 18 (2020) ........................................................ 6

*Shalom Pentecostal Church v. Acting Sec'y, United States Dep't of
  Homeland Sec.*,
  783 F.3d 156 (3rd Cir. 2015) .......................................... 13

*Sierra Club v. Trump*,
  929 F.3d 670 (9th Cir. 2019) .......................................... 13

*Thompson v. DeWine*,
  959 F.3d 804 (6th Cir. 2020) .......................................... 21

*In re Trump*,
  928 F.3d 360 (4th Cir. 2019) .......................................... 12

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) .................................................... 15

*United States v. Edward Rose & Sons*,
  384 F.3d 258 (6th Cir. 2004) .......................................... 23

*Wall v. United States EPA*,
  265 F.3d 426 (6th Cir. 2001) .......................................... 17

*Wilson v. Kasich*,
  134 Ohio St. 3d 221 (Ohio 2012) .................................... 22

**Statutes and Constitutional Provisions**

U.S. Const., art. I, §2 ................................................... 5, 9

5 U.S.C. §704 ................................................................................... 14

5 U.S.C. §706 ............................................................................. 14, 17

13 U.S.C. §141 ......................................................................... *passim*

28 U.S.C. §1361 ............................................................................... 24

Ohio Const., art. XI, §1 ..................................................................... 4

Ohio Const., art. XI, §3 ................................................. 5, 19, 20, 21

Ohio Const., art. XIX, §1 .............................................. 4, 5, 20

Ohio Const., art. XIX, §2 ................................................. 5, 19, 20, 21

Pub. L. No. 94-171, 89 Stat. 1023 (1975) ...................................... 7

## Other Authorities

132nd General Assembly, Substitute Senate Joint Resolution Number
    5 ........................................................................................................ 3

Hansi Lo Wang, *6-Month Delay in Census Redistricting Data Could
    Throw Elections Into Chaos*, NPR (Feb. 12, 2021) .................................. 2

James Whitehorne, *Timeline for Releasing Redistricting Data*, UNITED
    STATES CENSUS BUREAU (Feb. 12, 2021) ................................. 1, 11, 15, 18

Jessie Balmert, *Everyone complains about congressional
    gerrymandering. Ohio just did something about it*, Cincinnati.com
    (Feb. 6, 2018) ........................................................................................ 3

Jessie Balmert, *Ohio may have just ended gerrymandering; will others
    follow?*, CINCINNATI ENQUIRER 10A (Feb. 7, 2018) ................................. 3

*Press Release: Census Bureau Statement on Redistricting Data
    Timeline*, UNITED STATES CENSUS BUREAU (Feb. 12, 2021) .......... 1, 7, 11, 18

## INTRODUCTION

In 2015 and 2018, Ohioans went to the polls and overwhelmingly approved constitutional amendments to change the redistricting process. Those amendments, designed to prevent partisan gerrymandering, change the process by which Ohio draws its legislative districts. As a result, the Constitution today includes numerous requirements to ensure that all maps that the Ohio Redistricting Commission or the General Assembly adopt will enjoy significant bipartisan support.

The amended processes are set to be implemented for the first time this year, when the State draws legislative districts based on population data from the 2020 Census. But the State cannot use that data unless the Secretary of Commerce shares the data in time. That *should not* be a problem, because the Secretary is statutorily obligated to share the data no later than March 31, 2021. 13 U.S.C. §141(c). But it has become a problem nonetheless, because the Census Bureau—part of the Department of Commerce—recently announced that the Acting Secretary will not be complying with the statutory deadline. The Bureau, in its "February 12 Decision," announced that, "because of COVID-19-related shifts in data collection and in the data processing schedule," it will "deliver" the redistricting data at issue in §141(c) "to all states by Sept. 30, 2021." See *Press Release: Census Bureau Statement on Redistricting Data Timeline*, UNITED STATES CENSUS BUREAU (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html (Ex. 1 of Complt.); *accord* James Whitehorne, *Timeline for Releasing Redistricting Data*, UNITED STATES CENSUS BUREAU (Feb. 12,

1

2021), https://www.census.gov/newsroom/blogs/random-samplings/2021/02/timeline-redistricting-data.html (Ex. 2 of Complt.).

This delay in providing the data will seriously harm the States, who have redistricting to perform and elections to run notwithstanding any difficulties caused by COVID-19. *See* Hansi Lo Wang, *6-Month Delay in Census Redistricting Data Could Throw Elections Into Chaos*, NPR (Feb. 12, 2021), http://bit.do/fNEJ8. The harm is especially stark in Ohio, where the delay will undermine the State's efforts to draw legislative maps through the constitutionally mandated process—a process that, among other things, *requires* Ohio's Redistricting Commission to finalize state legislative districts by September 1, and to hold three public meetings before doing so. The many people who voted for redistricting reform deserve better than to have their efforts thwarted by a federal government that refuses to do its job. No doubt, the pandemic has greatly complicated the Census Bureau's task. But the pandemic has complicated the jobs of firefighters, police officers, and judges too. All those public servants found ways to continue fulfilling their obligations to the public, recognizing that government officials "may not shelter in place" while their duties go unfulfilled. *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 71 (2020) (Gorsuch, J., concurring). The defendants must not be permitted to evade their duties by citing a global pandemic that everyone else is finding ways to work through.

Because the February 12 Decision is unlawful, and because the Census Bureau adopted it in violation of the Administrative Procedure Act, this Court should vacate the Decision and enjoin the defendants from enforcing it with respect to

Ohio's data.  Alternatively, and if the Court determines that injunctive relief is unavailable, it should award a writ of mandamus, requiring the Acting Secretary to meet the March 31 deadline imposed by §141(c).  (From now on, this brief will refer to the Acting Secretary as simply "the Secretary".)

## BACKGROUND

**1.**  "Ohio may have just ended gerrymandering; will others follow?"  That was the headline in the Cincinnati Enquirer after a group of bipartisan legislators in Ohio's General Assembly worked together to propose an amendment to the Ohio Constitution.  *See* Jessie Balmert, *Ohio may have just ended gerrymandering; will others follow?*, CINCINNATI ENQUIRER 10A (Feb. 7, 2018), *online at* Jessie Balmert, *Everyone complains about congressional gerrymandering. Ohio just did something about it*, Cincinnati.com (Feb. 6, 2018), https://tinyurl.com/y6zqva6g.  The proposed amendment would reform the redistricting process so as to require significant bipartisan support for new maps.  *See* 132nd General Assembly, Substitute Senate Joint Resolution Number 5.  On May 8, 2018, the People of Ohio approved the proposed amendment by a 3-to-1 margin.  This followed on the heels of an earlier, 2015 amendment that had already modified the process by which maps are drawn—an amendment that passed by similarly overwhelming margins.  Ohioans will get their first chance the see the new redistricting process in action in 2021, when the State draws new maps in response to the 2020 Census.

Today, the Ohio Constitution creates two redistricting processes, one for the drawing of state legislative districts and another for drawing congressional dis-

tricts. The process for drawing state legislative districts is set out in Article XI of Ohio's Constitution. That Article creates a bipartisan, seven-member Ohio Redistricting Commission, which the Constitution vests with the power to draw state legislative maps. *Id*., §1(A). The Commission may approve a map only if the map receives the "affirmative vote of four members of the commission, including at least two members of the commission who represent each of the two largest political parties represented in the general assembly." *Id*., §1(B)(3). The group must reach agreement no later than "the first day of September of a year ending in the numeral one." *Id*., §1(C). Before doing so, the Commission "shall conduct a minimum of three public hearings across the state to present the proposed plan and shall seek public input." *Id*.

The Constitution prescribes a different method for the drawing of congressional districts. *See id*., art. XIX, §1. The General Assembly has until "the last day of September of a year ending in the numeral one" to adopt a congressional map. *Id*., §1(A). Before that date, it must secure "the affirmative vote of three-fifths of the members of each house of the general assembly, including the affirmative vote of at least one-half of the members of each of the two largest political parties represented in that house." *Id*. If the General Assembly fails to meet that deadline, then the Ohio Redistricting Commission "shall adopt a congressional district plan not later than the last day of October of that year." *Id*., §1(B). It can do so only with "the affirmative vote of four members of the commission, including at least two members of the commission" representing the "two largest political parties repre-

4

sented in the general assembly." *Id.*, §1(B).  If the Commission is unable to reach

an agreement, then the General Assembly may adopt a plan by the end of Novem-

ber.  This time, the plan must win the "affirmative vote of three-fifths of the mem-

bers of each house, including the affirmative vote of at least *one-third* of the mem-

bers of" the two largest parties.  *Id.*, §1(C)(2) (emphasis added).  Finally, and as a

fourth option if all other options fail, the General Assembly may adopt a plan by the

vote of a simple majority of members of each house.  *Id.*, §1(C)(3).  To deter the leg-

islature from relying on this fourth option, the Constitution specifies that any plans

adopted through this option expire after "two general elections for the United States

house of representatives."  *Id.*

 Both the Commission and the General Assembly are required to determine

population using data from "the federal decennial census."  Ohio Const., art. XI,

§3(A); art. XIX, §2(A)(2).  If and only if that data "is unavailable," the Commission

and the General Assembly may determine population on another "basis" selected by

the General Assembly.  Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2).

 **2.**  Ohio's redistricting process is heavily influenced by two principles of fed-

eral law.  *First*, States must draw congressional districts equal in number to the

number of seats they are apportioned based on their populations.  *See* U.S. Const.,

art. I, §2, cl.3.  *Second*, the one-person–one-vote principle requires States to draw

legislative districts that are roughly equivalent in population.  *See Evenwel v. Ab-

bott*, 136 S. Ct. 1120, 1123–24 (2016).  To abide by these principles, the States rely

on data provided through the census.  That is the data by which total population

(and so congressional apportionment) is decided. And that is the data that States use to ensure their districts are sufficiently equal in population.

Congress passed the Census Act to ensure the provision of this data. That Act says that the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the 'decennial census date.'" 13 U.S.C. §141(a). "The Secretary is aided in that task by the Census Bureau, a statistical agency housed within the Department of Commerce." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019).

One of the Secretary's most important census-related duties is codified at 13 U.S.C. §141(c). That section speaks to the Secretary's responsibility for providing the States with "tabulations of population" useful for drawing legislative districts. *Id*. It says that the Secretary "shall" complete those tabulations "as expeditiously as possible after the decennial census date." *Id*. At the very latest, however, "tabulations of population of each State … shall … be completed, reported, and transmitted to each respective State within one year after the decennial census date." *Id*. Because federal law defines the "decennial census date" as April 1, *see* §141(a), the Secretary complies with her obligation to provide the information "within one year after the decennial census date" if she gives it to the States no later than March 31.

**3.** While Congress could have extended the deadline, it did not do so. *Ross v. Nat'l Urban League*, 141 S. Ct. 18, 19 (2020) (Sotomayor, J., dissenting from grant of stay). Nonetheless, the Census Bureau has decided not to comply with the March

6

31 deadline. To be sure, that was not always the case; the Bureau at one time planned to submit to the States the "redistricting data" that §141(c) requires "by March 31." *See Press Release: Census Bureau Statement on Redistricting Data Timeline* (Ex. 1 of Complt). In other words, the Bureau *had* planned to comply with the §141(c) deadline.

But on February 12, the Census Bureau abandoned its plan to comply with the law. More specifically, the Bureau, on February 12, issued a press release announcing that it "will deliver the Public Law 94-171 redistricting data" to all states by Sept. 30, 2021," not "by March 31, 2021." *Id.* Because the "Public Law 94-171 redistricting data" is the data covered by 13 U.S.C. §141(c), *see* Pub. L. No. 94-171, 89 Stat. 1023 (1975), the Bureau's statement confirms that the Secretary will not be meeting the March 31, 2021 deadline that §141(c) imposes. The Bureau further announced: "Different from previous censuses, the Census Bureau will deliver the data for all states at once, instead of on a flow basis." *See Press Release: Census Bureau Statement on Redistricting Data Timeline* (Ex. 1 of Complt.).

**4.** On February 25, 2021, the State of Ohio filed this suit in the Southern District of Ohio. The complaint alleges that the Secretary will violate the Census Act, and in particular 13 U.S.C. §141(c), if she enforces the February 12 Decision and fails to release the data before March 31, 2021. The complaint additionally alleges that the defendants promulgated the February 12 Decision in violation of the Administrative Procedure Act.

## LEGAL STANDARD

Courts must balance "four factors … when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (internal quotation marks omitted). The standard for a permanent injunction is identical, except that the movant must show "actual success on the merits" instead of a likelihood of success on the merits. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

A court may grant a writ of mandamus to a petitioner who has "exhausted all other avenues of relief" and to whom the respondent owes "a clear nondiscretionary duty" that is going unfulfilled. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *accord Haddad v. EEOC*, No. 18-1034, 2019 U.S. App. LEXIS 13600, at *3 (6th Cir. May 6, 2019). If those showings are made, the court should grant a writ of mandamus if it is "satisfied that the writ is appropriate under the circumstances." *Cheney v. United States Dist. Court*, 542 U.S. 367, 381 (2004).

## ARGUMENT

This Court should enjoin the February 12 Decision. In the alternative, it should grant a writ of mandamus requiring the Secretary to share the redistricting data by March 31, 2021, as she is required to do under 13 U.S.C. §141(c).

I.  **The State of Ohio is entitled to an injunction requiring the Secretary to fulfill her statutory obligations under the Census Act.**

Ohio is entitled to an injunction forbidding the defendants from enforcing the February 12 Decision.

A.  **Ohio will prevail on the merits of its challenge.**

Ohio will prevail in its challenge to the February 12 Decision. The Decision violates both the Census Act and the Administrative Procedure Act. And this Court may set aside the Decision, and enjoin its enforcement, under either the Administrative Procedure Act or using its inherent equitable authority to enjoin illegal executive actions.

1.  **The February 12 Decision violates the Census Act.**

*a.  The Census Act imposes mandatory deadlines.* The States are entitled to representation in Congress based on their populations. Their populations are determined using an "actual Enumeration" conducted every ten years. U.S. Const., art. I, §2, cl.3. That enumeration is to be conducted "in such Manner as [Congress] shall by Law direct." *Id*.

The Census Act is one of the laws through which Congress has provided the needed direction. That act imposes a number of census-related obligations on the Secretary of Commerce. It says that the "Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of the population as of the first day of April of such year, which date shall be known as the 'decennial census date.'" §141(a). The statute then imposes one deadline of particular relevance here:

> The officers or public bodies having initial responsibility for the legislative apportionment or districting of each State may … submit to the

9

> Secretary a plan identifying the geographic areas for which specific tabulations of population are desired. … Tabulations of population for the areas identified in any plan approved by the Secretary shall be completed by him as expeditiously as possible after the decennial census date and reported to the Governor of the State involved and to the officers or public bodies having responsibility for legislative apportionment or districting of such State, except that such tabulations of population of each State requesting a tabulation plan, and basic tabulations of population of each other State, shall, in any event, be completed, reported, and transmitted to each respective State *within one year after the decennial census date.*

13 U.S.C. §141(c) (emphasis added).

Breaking this down, the Secretary "shall" tabulate the population figures needed for redistricting "as expeditiously as possible after the decennial census date," and the Secretary "shall … complete[], report[], and transmit[]" those tabulations "to each respective State within one year after the decennial census date." The "decennial census date" is April 1. *See* §141(a). Thus, to complete, report, and transmit the tabulations within one year after the decennial census date, the Secretary must do all that by March 31, 2021.

Section 141(c) imposes a mandatory March 31 deadline, not an aspirational target date. *See New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 796 (S.D.N.Y. 2018). Again, that statute says that the Secretary "*shall*" complete, record, and transmit the tabulation of specific population areas to the States no later than March 31. §141(c) (emphasis added). The clearest indication that the law imposes a mandatory deadline is its use of "mandatory language: 'shall.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."

10

*Id.* (quoting *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016)); *accord Cook v. FDA*, 733 F.3d 1, 7 (D.C. Cir. 2013). In the Census Act, as in other statutes, "Congress used 'shall' to impose discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 241 (2001).

**b. *The Secretary may not ignore mandatory deadlines.*** The Census Bureau's February 12 Decision announces that the Secretary will ignore the March 31 deadline imposed by §141(c). Instead of meeting that deadline, the Census Bureau announced, it "will deliver" the "redistricting data"—meaning the data required by §141(c)—"to all states by Sept. 30, 2021." *See Press Release: Census Bureau Statement on Redistricting Data Timeline* (Ex. 1 of Complt.). In other words, the Census Bureau has granted itself (and so the Secretary) an extension of six months in which to meet the March 31 deadline that §141(c) imposes.

The Secretary's plan is illegal, and neither the Census Bureau nor the Secretary could plausibly contend otherwise. Indeed, the Bureau has not even gestured at a legal justification, offering instead a practical one: "COVID-19 delayed census operations significantly." Whitehorne, *Timeline for Releasing Redistricting Data* (Ex. 2 of Complt.). Surely it is true that the pandemic has made the statutory deadlines harder to meet. That, however, is legally irrelevant. Section 141 creates no hardship exception. Indeed, the law contains no exception at all, and in fact says that the redistricting data must be disseminated "*in any event*" within a year. "The statute says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cty. Emples. Ret. Fund*, 138 S. Ct. 1061, 1069 (2018).

And because the statute does not say that the mandatory deadlines can be ignored in the event of a pandemic or other unforeseen difficulties, the Secretary and the Bureau must adhere to those deadlines even in the midst of this pandemic.

*c. Ohio is entitled to an injunction.* This Court may enjoin the Secretary's violation of the Census Act using its inherent equitable authority to enjoin illegal executive action. (Below, the State explains that the Administrative Procedure Act provides a second, independent basis for enjoining the February 12 Decision.)

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state and federal officials "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (citing *Osborn v. Bank of United States*, 9 Wheat. 738, 838–39 (1824); *Ex parte Young*, 209 U.S. 123, 150–51 (1908); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). This power to enjoin unlawful "actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327. While Congress may *prohibit* courts from awarding such equitable relief, *id*. at 327–28, Congress need not *confer* the power to award such relief in order for courts to exercise that power: the power is an inherent aspect of the courts' equitable authority, *see, e.g.*, *Am. School of Magnetic Healing*, 187 U.S. at 110; *see also Barry v. Lyon*, No. 13-cv-13185, 2015 U.S. Dist. LEXIS 174347, at *5 (E.D. Mich. June 5, 2015); *In re Trump*, 928 F.3d 360, 373 (4th Cir. 2019); *Int'l Refugee Assistance Pro-*

12

*ject v. Trump*, 883 F.3d 233, 287 (4th Cir. 2018) (*en banc*) (Gregory, J., concurring); *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019); *CNSP, Inc. v. City of Santa Fe*, 755 F. App'x 845, 849 (10th Cir. 2019).

Thus, in furtherance of the "basic presumption of judicial review" for those adversely affected by agency action, *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), the courts of appeals have recognized "judicial review is available when an agency acts ultra vires," *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173, (D.C. Cir. 2003); *see also, e.g.*, *Shalom Pentecostal Church v. Acting Sec'y, United States Dep't of Homeland Sec.*, 783 F.3d 156, 168 (3rd Cir. 2015).  Federal administrative agencies, as bodies of the executive branch, have only the power to act as expressly provided by Congress.  *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) ("for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it" (quoting *New York v. FERC*, 535 U. S. 1, 18 (2002)).  Actions that exceed that authority are properly enjoined.

As already explained above, the February 12 Decision exceeds the Census Bureau's and the Secretary's constitutionally conferred authority and is illegal.  The February 12 Decision commits the Secretary to unlawfully ignoring the mandatory deadline that §141(c) imposes.  Because Congress has not foreclosed the courts from awarding injunctions to ensure compliance with the Census Act, the Court retains its equitable power to do so.

**2.    The February 12 Decision violates the Administrative Procedure Act.**

The Administrative Procedure Act, commonly known as the "APA," requires courts to set aside "final agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The February 12 Decision is a "final agency action" that may be challenged under the APA. Because the Decision is not in accordance with law and arbitrary and capricious, it is invalid under the APA. The APA thus provides a second, independent basis—the first being the Court's inherent equitable authority—for setting aside the February 12 Decision and enjoining its enforcement.

***a. The February 12 Decision is a "final agency action."*** The APA allows judicial review of "final agency action[s]." 5 U.S.C. §704. "An agency action must generally meet two conditions to be considered 'final' under the APA." *Berry v. Dep't of Labor*, 832 F. 3d 627, 633 (6th Cir. 2016) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). First, the action must mark the "consummation of the agency's decisionmaking process"; second, the action must "determine rights and obligations of a party or cause legal consequences." *Id.* (internal citations omitted); *accord Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 495–96 (6th Cir. 2014). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). "An agency action is not final if it 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'"

*Jama*, 760 F.3d at 496. This is an inherently "pragmatic" inquiry; finality is determined with reference to the facts on the ground. *Hawkes*, 136 S. Ct. at 1815.

The February 12 Decision is final. First, it reflects the "consummation of the agency's decisoinmaking process" on the question whether the agency will provide the States with the data to which they are entitled by the March 31, 2021 deadline. *Berry*, 832 F. 3d at 633. The agency expressly declared that it has "been able to *finalize* a schedule for the redistricting data." Whitehorne, *Timeline for Releasing Redistricting Data* (Ex. 2 of Complt.). It further announced what that finalized schedule entails: "The U.S. Census Bureau … will deliver the [§141(c)] redistricting data to all states by Sept. 30, 2021." *Id.* That is not a tentative conclusion or a warning that data *may be* delayed beyond the March 31, 2021 due date; it is a final determination that the release *will be* delayed.

Second, the February 12 Decision, by settling on a delayed release of the data and a commitment not to release the data by March 31, "cause[s] legal consequences." Specifically, the February 12 Decision guarantees that the Secretary will breach her duty to meet the March 31 deadline that §141(c) imposes. That consequence affects not only the Secretary, but also the States, because the delay ensures that the federal government will violate the States' right, under §141(c), to receive redistricting data before March 31, 2021. The failure to give the States the data they are entitled to by the date they are entitled to it will have real-world effects. The Census Bureau itself acknowledged "the difficulties that this delayed delivery of the redistricting data will cause some states." Whitehorne, *Timeline for Releas-*

15

*ing Redistricting Data* (Ex. 2 of Complt.).  Thus, this is not a case in which the harm to the State depends "on the contingency of future administrative action."  *Jama*, 760 F.3d at 496.  To the contrary, the February 12 Decision establishes *with certainty* that the States will be denied their right to receive redistricting data by March 31.

The February 12 Decision is precisely the sort of decision the Sixth Circuit has held constitutes final agency action.  In *Berry*, for example, this Court held that the Department of Labor took a "final agency action" when it formally declined to reopen a claim under the Energy Employees Occupational Illness Program Act.  The decision was "final," the Sixth Circuit held, because it was non-tentative and definitively established that the aggrieved party would not obtain compensation to which he claimed entitlement.  *Berry*, 832 F.3d at 633–34.  The same logic supports a finality finding here, where the February 12 Decision definitively establishes that the States will not get the data to which they are entitled before the date by which they are entitled to it.  The Sixth Circuit's decision in *Hosseini v. Johnson*, 826 F.3d 354 (6th Cir. 2016), provides another useful analogy.  That case held that the Citizenship and Immigration Service's denial of an application for permanent residency constituted a final agency action.  *Id*. at 356.  Why?  Because the denial was conclusive and because it had the effect of depriving the applicant of (among other things) "the right to live permanently in the United States."  *Id*. at 362.  Similarly here, the February 12 Decision denies the State the right to receive redistricting data by March 31.

16

***b. The February 12 Decision is arbitrary and capricious or otherwise not in accordance with law.*** For two separate reasons, the February 12 Decision violates the APA.

*First*, it is contrary to law. Again, the APA requires that courts "hold unlawful and set aside [an] agency action" if the action is "arbitrary, capricious, an abuse of discretion or *otherwise not in accordance with law*." 5 U.S.C. §706(2)(A) (emphasis added). So when an agency takes an action that is "inconsistent with the statutory mandate," that action violates the APA. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1350 (6th Cir. 1994); *see also Wall v. United States EPA*, 265 F.3d 426, 435 (6th Cir. 2001) (quotation omitted). For the reasons already discussed, the February 12 Decision is contrary to law: it commits the Secretary and the Census Bureau to violating the Census Act's mandatory March 31, 2021 deadline for sharing redistricting data with the States.

*Second*, the February 12 Decision is arbitrary and capricious because it was made without adequate consideration of many concerns bearing on the decision whether to comply with the deadline. An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agencies must, among other things, "assess whether there were reliance interests, determine whether they were significant, and weigh

17

any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020).

The defendants failed to satisfy these requirements. First, the Bureau did not consider and rationally respond to the problems its tardiness created. *See State Farm*, 463 U.S. at 43. The agency acknowledged a very serious problem with any delay: "Some states have statutory or even state constitutional deadlines and processes that they will have to address due to this delay." Whitehorne, *Timeline for Releasing Redistricting Data* (Ex. 2 of Complt.). But the agency apparently failed to consider an obvious option for avoiding, or at least mitigating, that problem: releasing data as it becomes available, giving priority to States with early and inflexible deadlines, instead of releasing all the data to every State at once. The Bureau acknowledged that it *used to* use rolling releases, when it explained that this year, "*[d]ifferent from previous censuses*, the Census Bureau will deliver the data for all states at once, instead of on a flow basis." *Press Release: Census Bureau Statement on Redistricting Data Timeline* (Ex. 1 of Complt.) (emphasis added).

The Bureau gave no good reason for departing from that practice. It claimed that its "single national delivery" would ensure "that the Census Bureau can provide accurate, high quality, and fit-for-use data in the least total amount of time to all states." Whitehorne, *Timeline for Releasing Redistricting Data* (Ex. 2 of Complt.). But this "least total time" metric does not in any way address the difficulty posed by different States needing data at different times. Given the Census Bureau's express acknowledgment of unique state needs, the Census Bureau should

18

have considered prioritizing delivery to States with early and inflexible deadlines. *Cf. State Farm*, 463 U.S. at 51; *Regents*, 140 S. Ct. at 1912.  There is no indication it did so.

The agency additionally failed to properly "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915.  The State of Ohio (and likely other States) designed redistricting processes in reliance on the Secretary's complying with her statutory obligations.  For example, the Ohio Constitution *requires* the Ohio Redistricting Commission and the General Assembly to use census data when redistricting if that data is available.  Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2).  But the Ohio Constitution also imposes September 1 and September 30 deadlines as addressed above.  The State can simultaneously effectuate the preference for the use of census data and the constitutional deadlines *only if* the Census Bureau provides the State with data well in advance of the deadlines.  In other words, the constitutional process relies to some degree on the Census Bureau's adhering to §141(c).  There is no evidence that the Bureau considered these reliance issues.

*      *      *

In sum, the State will prevail on the merits of its claim that the February 12 Decision violates the Census Act and the APA.

**B.    Ohio will be irreparably harmed without an injunction.**

The State will be irreparably harmed absent an injunction forbidding the Secretary from delaying the release of redistricting data until September 30, be-

19

cause the delay will prevent the State from carrying out the redistricting process in the constitutionally preferred manner.

When the People of Ohio adopted the provisions in Articles XI and XIX of their Constitution, they overwhelmingly determined that state and congressional districts should be drawn using "decennial census data." Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2). Indeed, the Ohio Redistricting Commission and the General Assembly *must use* decennial census data if it is available; only if that data is "unavailable" may they use anything else. Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2). The People also imposed deadlines for drawing legislative maps. Relevant here, the Ohio Redistricting Commission must finalize its map by September 1, and it must hold three public hearings to solicit public input before doing so. With respect to congressional districts, the Constitution gives the General Assembly until just September 30 to pass a map before authority to do so shifts to the Ohio Redistricting Commission. *Id*., art. XIX, §1.

If the February 12 Decision remains in place, it will be impossible for the State to meet the September 1 and September 30 deadlines using data from the decennial census. The State will have to rely on data other than the census data. No doubt, the Ohio Constitution permits the use of other data when necessary: if (and only if) census data is "unavailable," the State may conduct redistricting using population figures "determined" on another "basis as the general assembly may direct." Ohio Const., art. XI, §3(A); *see also* art. XIX, §2(A)(2) (if and only if census data is "unavailable," population may "determined" for purposes of congressional districts

20

"by … another basis as directed by the general assembly").  But requiring the State to rely on this backup option constitutes irreparable harm.  The reason is that States suffer "a form of irreparable injury" every time they are blocked "from effectuating" state law.  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020).  Therefore, by barring the State from "effectuating" the constitutionally preferred method of redistricting—namely, redistricting that uses population figures determined based on the decennial census—the February 12 Decision causes irreparable harm.

An analogy helps illustrate the harm.  Imagine a court order enjoining Ohio from using census data in redistricting, but leaving the State free to redistrict by determining population on "such other basis as the general assembly may direct." Ohio Const., art. XI, §3(A); *see also* art. XIX, §2(A)(2).  That order would unambiguously constitute irreparable harm:  because state law requires using decennial census data as a first-best option, and because the order would enjoin use of the data, the order would irreparably injure the State by blocking it from "effectuating" state law.  *King*, 133 S. Ct. at 3 (Roberts, C.J., in chambers); *accord Abbott*, 138 S. Ct. at 2324; *Thompson*, 959 F.3d at 812.  Now return to this case.  The February 12 Decision is practically indistinguishable from the hypothetical court order enjoining the use of census data, and it therefore causes irreparable harm in precisely the same manner.  The February 12 Decision, just like the hypothetical injunction, blocks the State from conducting redistricting in the constitutionally preferred manner, and

21

thus blocks it from best "effectuating" state law.  *Maryland*, 133 S. Ct. at 3.  That is irreparable harm as a matter of law, without regard to the adequacy, as a factual matter, of the option to proceed without census data.  (Along the same lines, the State would suffer irreparable harm even if Ohio courts might recognize a *force majeure* exception that would permit the extension of deadlines to adjust for emergencies:  forcing the State to invoke that exception means preventing it from drawing new districts using the primary methods prescribed by state law, which require the use of census data to draw maps by the constitutionally prescribed deadlines.)

The need to use alternative data will irreparably harm the State in another way, too:  the uncertainty and the inevitable debates over which data to use are sure to sow distrust in the entire redistricting process.  That will undermine the State's significant interest "in protecting public confidence in the integrity and legitimacy of representative government."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (op. of Stevens, J.) (quotation omitted); *see also Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).  To make matters worse, the harm will be intensified by litigants who have every incentive to portray whatever the State does in response to the February 12 Decision in the most negative light possible. That litigation is inevitable.  Ohio, over the past decade, has faced a barrage of suits asking courts to become "entangled, as overseers and micromanagers, in the minutiae of" Ohio's "election processes" generally, *Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016), and its redistricting process in particular, *see, e.g.*, *Householder v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 101 (2019); *Wilson v.*

*Kasich*, 134 Ohio St. 3d 221 (Ohio 2012). The trend is sure to continue, and perhaps intensify, after a redistricting process complicated by the Census Bureau's inaction.

## C. Enjoining the February 12 Decision will not cause substantial harm to others.

An injunction here will not cause substantial harm to others. To the contrary, States around the Union will benefit from an order requiring the Secretary to do her job. That is especially so because an injunction along those lines need not sacrifice accuracy: the federal government, with all its resources, can surely find a way to count all its citizens accurately and on an expedited basis. That may cost money and will demand resources. But "injuries, however substantial, in terms of money, time and energy necessarily expended in compliance with an injunction are not enough" to defeat a request for injunctive relief. *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (quotation omitted).

Regardless, *even if* the Secretary or someone else might sustain some legally cognizable harm from an injunction, that would mean only that this case is one "in which irreparable harm will befall one side or the other of the dispute no matter what." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)). In those situations, the possibility that others might be harmed by one party being made to do what the law requires of it does not militate against issuance of an injunction. *See id*.

If the Court is concerned about the harm an injunction might pose to third parties or the defendants, it can limit the risk of such harm by granting tailored re-

lief. For example, it could enjoin the February 12 Decision *only* in its application to Ohio's data. It might further reduce any risk of such harms by enjoining the Secretary from delaying the release of the data beyond a date this Court deems equitable and reasonable under all the circumstances, still enabling the State to use the census data in meeting its September 1 and September 30 deadlines.

### D.    Enjoining the February 12 Decision will serve the public interest.

Finally, the public interest favors an injunction. The "public interest lies in a correct application of the" law, and "upon the will of the people … being effected in accordance with [the] law." *Coal. to Defend Affirmative Action*, 473 F.3d at 252. Because federal law requires the Secretary to timely submit population tabulations, and because the will of Ohioans with regard to legislative redistricting cannot be effectuated in the primary method set out by state law unless the Court enjoins the February 12 Decision, an injunction will serve the public interest.

## II.    If the Court determines that it may not issue an injunction, it should issue a writ of mandamus ordering the Secretary to comply with 13 U.S.C. §141(c).

If the Court determines that the State is for some reason prohibited from seeking an injunction against the Secretary, it should award a writ of mandamus requiring the Secretary to timely complete and deliver all data subject to §141(c)'s mandatory commands.

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. A court may

grant a writ of mandamus to a petitioner who has "exhausted all other avenues of relief" for enforcing "a clear nondiscretionary duty" that the respondent owes to it. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *accord Haddad v. EEOC*, No. 18-1034, 2019 U.S. App. LEXIS 13600, at *3 (6th Cir. May 6, 2019). The court must also assure itself "that the writ is appropriate under the circumstances." *Cheney v. United States Dist. Court*, 542 U.S. 367, 381 (2004).

The State can satisfy every requirement. *First*, the State has nowhere else to turn for relief. If some yet-unknown barrier prevents the State from suing for an injunction, then the State has no way to protect itself from imminent injury except by obtaining a writ of mandamus. *Second*, the writ of mandamus is needed to keep the Secretary from breaching a "clear nondiscretionary duty." *Ringer*, 466 U.S. at 616. As discussed above, the "shall" language in §141(c) gives the Secretary a mandatory duty to complete, report, and transmit redistricting data. *Finally*, because the Secretary's failure to act in a timely fashion will cause the irreparable harms discussed above, issuance of "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381.

## CONCLUSION

The Court should grant the motion for an injunction or, in the alternative, grant the State's petition for a writ of mandamus.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
 *Trial Attorney*
MAY DAVIS (PHV application pending)
Deputy Solicitor General
BRIDGET C. COONTZ (0072919)
Section Chief, Constitutional Offices
JULIE M. PFEIFFER (0069762)
30 East Broad Street, 17th Floor
6l4-466-8980
614-466-5087; fax
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

26

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2021 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by certified mail upon all parties for whom counsel has not yet entered an appearance electronically, at the following addresses:

David DeVillers
United States Attorney for the
Southern District of Ohio
U.S. Attorney's Office
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Monty Wilkinson
Acting Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil-Process Clerk
Office of the United States Attorney
for the Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

Ron S. Jarmin
Acting Director
U.S. Census Bureau
4600 Silver Hill Road
Washington, DC 20233

Wynn Coggins
Acting Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

U.S. Census Bureau
4600 Silver Hill Road
Washington, DC 20233

U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

I further certify that I served a copy of this motion by e-mail upon:

27

Matthew J. Horwitz
Civil Chief
United States Attorney for the
Southern District of Ohio
Matthew.Horwitz@usdoj.gov