**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

STATE OF OHIO,

                Plaintiff,

    v.

GINA RAIMONDO, in her official ca-
pacity as Secretary of Commerce,* *et al.*,

                Defendants.

Case No. 3:21-cv-00064-TMR

District Judge Thomas M. Rose

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION AND WRIT OF MANDAMUS**

---

    * Gina Raimondo was recently confirmed as the Secretary of Commerce and has been automatically substituted for Wynn Coggins, the former Acting Secretary of Commerce, under Federal Rule of Civil Procedure 25(d).

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND .................................................................................................3

ARGUMENT .......................................................................................................6

I.     Ohio lacks standing. ...............................................................................6

Ohio fails to carry its burden of showing "that [it] has 'suffered an injury in fact,' the injury is 'traceable' to the defendant's action, and a favorable decision likely will redress the harm." *Turaani v. Wray*, --- F.3d. ---, 2021 WL 631473, at *1 (6th Cir. Feb. 18, 2021) (citing *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019)); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020).

A.     Ohio's purported injury is not redressable because it is impossible for the Census Bureau to produce redistricting data by March 31............13

Ohio's purported injury is not redressable by the Court because it is impossible for the Census Bureau to produce the redistricting data Ohio wants by the March 31 statutory deadline. An injury is redressable only "if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). "[A] court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167–68 (D.C. Cir. 2017). Indeed, "[i]t has long been settled that a federal court has no authority to . . . declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). The Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 167–68.

B.     Ohio has not established injury in fact or traceability.................................7

Ohio admits it does not need the Census Bureau's data to redistrict. Compl. ¶¶ 2, 31. Indeed, Ohio's constitution contemplates ways in which redistricting can be accomplished in the absence of census data. *See* Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2); *see also* art. XIX, §§1(D), (E). The absence of census data thus does not impede the state from implementing its constitutional scheme or otherwise impinge on its sovereign interests in effectuating its law. Without a concrete, cognizable harm, Ohio is left claiming a purely procedural injury—*i.e.* the frustration of its expectation that the Census Bureau will follow the timelines prescribed in 13 U.S.C. § 141(c). And Courts routinely find such procedural injuries insufficient for Article III

standing. *See, e.g., Huff*, 923 F.3d at 465–66; *Lyshe v. Levy*, 854 F.3d 855, 860 (6th Cir. 2017). For similar reasons, Ohio cannot establish traceability. No stricture of the federal government requires States to use decennial census data in redistricting, so long as the redistricting complies with the Constitution and the Voting Rights Act. *See Burns v. Richardson*, 384 U.S. 73, 91 (1966). So any purported redistricting harm is traceable to Ohio's independent decisions about redistricting, not "the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

II.     Ohio has not proven that it is entitled to a preliminary injunction. ....................15

Ohio is not entitled to the "extraordinary and drastic remedy" of a preliminary injunction, which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019).

A.     Ohio is unlikely to succeed on the merits of its claims. ..............................15

1.     Ohio's Claim Under the Court's "Inherent Equitable Authority" Is Not Likely to Succeed. ................................................................16

"[L]egal remedies to enforce federal statutes must stem from the legislatively enacted statute, not from court-created equitable enforcement actions." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). Ohio's attempt to pursue a claim "in equity" fails for at least three reasons. *First*, Congress has already provided an express mechanism for plaintiffs to challenge federal agency action (and inaction) through the Administrative Procedure Act, and Ohio cannot sidestep that framework. *Second*, any equitable jurisdiction is limited to relief that "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and does not include the relief Ohio seeks here. *Finally*, it would be inequitable to "require an agency to render performance that is impossible." *Am. Hosp. Ass'n*, 867 F.3d at 167.

2.     Ohio's APA Challenge To The February 12 Press Release Is Not Likely To Succeed. ..........................................................................19

Ohio's APA claims focus exclusively on a February 12 Press Release and related blog post. PI Mot. at 14. But the Sixth Circuit has recognized that final agency action occurs when the Secretary reports the final redistricting numbers. *See City of Detroit v. Sec'y of Commerce*, 4 F.3d 1367, 1377 n.6 (6th Cir. 1993). So the February 12 Press Release is not final agency action reviewable under the APA. The February

12 Press Release does not constitute final agency action for three independent reasons. *First*, it does not constitute a consummation of the decisionmaking process. *Second*, it did not change any legal rights or have any legal consequence. *Finally*, Ohio's challenge fails the final-agency-action inquiry because it is a "broad programmatic attack" on the Census Bureau's operations, not a "circumscribed, discrete agency action[]." *Id.* at 61–62. In all events, even assuming that the February 12 Press Release could be considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," all the Court could do at final judgment is "set [it] aside" and "remand [it] to the agency for additional investigation." 5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

B.    Ohio will suffer no harm, much less irreparable harm. ............................ 23

Ohio cannot obtain an injunction without establishing that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[A]lthough the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). And because a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), Ohio's burden to show irreparable harm is necessarily higher than what is required to establish standing. *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Yet Ohio fails this test for all the same reasons it fails to establish standing: the State cannot show that it will suffer any injury *at all*.

C.    Defendants and the public would be harmed by an injunction ................. 25

The harm to the government and to the public from an injunction would be great and immediate. An injunction would be largely, if not wholly, impossible to implement because the Census Bureau simply lacks the ability to produce the redistricting data on the timeline Ohio wants. An order requiring the Census Bureau to nonetheless attempt to do so would yet again disrupt census operations, reduce the time for data quality checks, and make it even more difficult for the Census Bureau to complete its work. The harm from such a disruption would reverberate to other states and the public at large. If the Census Bureau were required to prioritize Ohio's data, it may well have to delay delivery of other states' data until past September 30, 2021. Such a delay would disrupt those other States' redistricting plans—presumably leading those States to suffer the same kinds of harms Ohio alleges in this lawsuit.

III.     Mandamus relief is unavailable. ...........................................................................27

"The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 491 (6th Cir. 2011) (in-ternal quotation and alteration marks omitted). And "[e]ven when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (internal quotation marks omitted). Ohio is not entitled to mandamus relief for two independent reasons. Initially, Ohio has not demonstrated a clear, mandatory duty that would afford it with a clear right to relief because "it is anything but clear that Congress intended the deadline[] at issue to be mandatory rather than directory." *Friends of Aquifer, Inc. v. Mineta*, 150 F. Supp. 2d 1297, 1300 (N.D. Fla. 2001); *see also Robertson v. Attorney General of U.S.*, 957 F. Supp. 1035, 1037 (N.D. Ill. 1997). Ohio is also not entitled to mandamus relief because, again, the relief it seeks is impossible to provide. "[T]he writ of mandamus will not issue to compel the performance of that which cannot legally be accomplished." *Am. Hosp. Ass'n*, 867 F.3d at 167. "[P]ossibility is a necessary and antecedent condition for the writ's issuance." *Id.* at 169 (collecting sources); *accord* 52 Am. Jur. 2d § 24; 55 C.J.S. Mandamus § 19.

CONCLUSION ...............................................................................................................30

## INTRODUCTION

For more than a decade, the U.S. Census Bureau—working under the Secretary of Commerce—has meticulously researched, tested, and planned the most advanced decennial census in history, all with the goal of counting every resident of the United States once, only once, and in the right place. This 15.6-billion-dollar endeavor culminated in the constitutionally mandated headcount conducted last year, which will apportion Members of the House of Representatives among the States and guide billions more in federal funds for the next ten years. But the COVID-19 pandemic, hurricanes, wildfires, civil unrest, litigation, and data-processing issues that unavoidably arise when compiling statistics for approximately 330 million people have all regrettably delayed the final census results.

Ohio—like many other States—is understandably frustrated with that delay, especially because it will not receive census-based redistricting data by the statutory deadline of March 31, 2021. *See* 13 U.S.C. § 141(c). But Ohio fails to satisfy the most basic requirement for invoking this Court's powers: it does not have standing to bring this lawsuit. Most fundamentally, a favorable ruling would not meaningfully redress any harm Ohio might allege because "[p]roducing redistricting data by, or even close to, the statutory deadline of March 31, 2021 is not possible under any scenario." Whitehorne Decl. ¶ 12. Nothing Ohio could argue, and nothing the Court could order, will change that reality. Nor has Ohio carried its burden of establishing that it will suffer a concrete injury from a delay in redistricting data or that any injury is traceable to the Census Bureau's actions, as opposed to Ohio's choices about the schedule for conducting its redistricting and elections with no flexibility to adjust for a delay in issuance of the census data during the COVID-19 pandemic (as well any decision to use census data under such circumstances).

Ohio is also unlikely to succeed on the merits of its preliminary-injunction and mandamus arguments. The Court has no inherent equitable authority to conjure a novel

cause of action that was not traditionally accorded by courts of equity. And even if it did, the Court should decline to do so here because it is impossible for the Census Bureau to provide redistricting data by March 31. For similar reasons, the Court should not issue a writ of mandamus to interfere with data-processing operations that are "dependent upon technological complexities and developments that are peculiarly within" the Census Bureau's expertise and impossible to complete by the statutory deadline. *Friends of Aquifer, Inc. v. Mineta*, 150 F. Supp. 2d 1297, 1301 (N.D. Fla. 2001). And Ohio's Administrative Procedure Act claims fare no better. The February 12, 2021 Press Release that Ohio seeks to challenge was a purely informational snapshot of the Census Bureau's timeline for producing redistricting data; it was not a "final agency action" subject to APA review.

Finally, the Court should reject Ohio's claim that it will be irreparably harmed because its state legislators may need to legislate in accordance with the state's constitution to select another source of data for redistricting—or by public debates that such legislation may spur. Public engagement is a virtue, not a fault, of the democratic process; it cannot be said to impair any kind of state interest, much less do so irreparably. On the other hand, granting Ohio relief would gravely harm Defendants and the country. Requiring the Census Bureau to prioritize Ohio's data would not only upend the Census Bureau's carefully calibrated operations, but could well delay delivery of *other* States' data, causing further nationwide disruptions. Whitehorn Decl. ¶¶ 24–28. There is no reason for the Court to venture into that thicket. Congress may soon moot these issues by extending the current statutory deadlines. And, even if it doesn't, States like Ohio are fully capable of remedying their self-imposed redistricting constraints. Many States have already done so without rushing to court and demanding the impossible. This Court should not order the production of redistricting data that does not exist by a statutory deadline that is impossible to meet.

## BACKGROUND

In order to apportion Members of the House of Representatives among the States, the Constitution requires an "actual Enumeration" of the population every 10 years, to be made "in such Manner" as Congress "shall by Law direct." U.S. Const. art. I, § 2, cl. 3; amend. XIV § 2. But the "population count derived from the census" goes beyond apportioning representatives; it is also used "to allocate federal funds to the States and to draw electoral districts." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019) (citation omitted). So it is no surprise that the decennial census is considered "one of the most critical constitutional functions our Federal Government performs." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997) ("1998 Appropriations Act"). To ensure the census's integrity, "[t]he Framers assigned the task of enumeration to the federal government to make the apportionment count as objective as possible and to avoid the possibility of corruption by state politics." *NAACP v. Bureau of Census*, 382 F. Supp. 3d 349, 357 (D. Md. 2019) (citation omitted). Within the federal government, Congress has "virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting U.S. Const. art. I, § 2, cl. 3). And through the Census Act, Congress has largely delegated its census authority to the Secretary of Commerce, who is assisted by the Census Bureau. *Id.*; 13 U.S.C. § 141(a); 13 U.S.C. §§ 2, 4.

As Congress has recognized, "the decennial enumeration of the population is a complex and vast undertaking." 1998 Appropriations Act, § 209(a)(8), 111 Stat. at 2481 (1997). The 2020 Census is the paragon. It was the culmination of an estimated $15.6 billion and over a decade of "planning, research, design, development, and execution" by thousands of Census Bureau employees to count approximately 330 million people across 3.8 million square miles. Thieme Decl. ¶¶ 4–5. This "massive undertaking" consisted of "35 operations using 52 separate systems" and a "master schedule, which has

3

over 27,000 separate lines of census activities." *Id.* ¶ 4. Even before the statutory census day of April 1, 2020, the Census Bureau used satellite imagery and in-person inspections to establish a Master Address File containing every address in the country. *Id.* ¶¶ 8–11; 13 U.S.C. § 141(a). As census day drew near, households across the nation received an invitation by mail to complete the census, accompanied by a massive 700-million-dollar campaign to encourage participation in the constitutional survey. *Id.* ¶¶ 12–18. If a household did not respond online, by phone, or by mail, the Census Bureau sent up to five additional mailings. *Id.* ¶ 16. And if a household still did not respond—as occurred for about 33% of the population—the Census Bureau attempted to enumerate them in person. *Id.* ¶¶ 18–28.

But the COVID-19 pandemic intervened. While the original plan was for the Census Bureau to begin in-person operations (called Nonresponse Followup or NRFU) in May 2020, it was forced to suspend those operations for months. *Id.* ¶ 30. By the time the Census Bureau entered the field in earnest three months later, it did so during a perfect storm of natural disasters and civil unrest. *Id.* ¶ 33. "Devastating hurricanes in the Gulf Coast area . . . limited and slowed the Census Bureau's ability to conduct NRFU operations." *Id.* In "large areas of the West Coast, field operations were hampered by conflagrations that caused health alerts due to fire and smoke." *Id.* And "in cities across the country," civil unrest made the already-difficult enumeration even harder. *Id.*

Making matters worse, the Secretary and the Census Bureau were under a statutory directive to report the census results to the President by December 31, 2020 so that he could timely submit them to Congress for reapportionment of the House. *See* 13 U.S.C. § 141(b); 2 U.S.C. § 2a. And although the Executive had asked for an extension of these statutory deadlines, Congress did not oblige. *Id.* ¶ 34. So the Census Bureau again adjusted its operations in an attempt to meet the statutory deadlines. *Id.* ¶ 35. But that adjustment led to the intervention of another Branch: the Judiciary. After a court-ordered preliminary injunction forced the Census Bureau to remain in the field, an emergency

Supreme Court ruling stayed that injunction and allowed the Census Bureau to conclude field operations in mid-October 2020, having resolved 99.9% of all housing units in the process. *See Ross v. Nat'l Urb. League*, 141 S. Ct. 18 (2020); Thieme Decl. ¶ 35.

But collecting responses through completed questionnaires and in-person field work is not the end of the story—the Census Bureau must then "summarize the individual and household data that [it] collect[ed] into usable, high-quality tabulations." Thieme Decl. ¶ 36. Although creating such tabulations may sound easy, it's not. The Census Bureau must integrate data from different enumeration methods used across the country, identify any issues or inconsistencies that arise, rectify them, and produce tabulations that will guide the country for the next ten years, all without compromising its statutory mandate to maintain the confidentiality of census responses. 13 U.S.C. § 9; Thieme Decl. ¶¶ 56-62 (describing how administrative records are incorporated and data is reconciled to produce the Census Unedited File); *id.* ¶¶ 63-67 (describing how the federally affiliated overseas population is incorporated into the data to produce apportionment numbers); *id.* ¶¶ 68-72 (describing the iterative process for compiling detailed information such as race, ethnicity, and age to produce the Census Edited File); *id.* ¶¶ 74-77 (describing the process for applying the Census Bureua's data privacy protection method); *id.* ¶¶ 78-81 (describing the process for generating usable data files).

Even using "computer processing systems" with "the latest hardware, database, and processing technology available," and working "with all possible dispatch," the Census Bureau was not able to meet its December 31, 2020 statutory deadline for reporting apportionment numbers. Thieme Decl. ¶ 37. Due to the difficulties encountered during data collection and issues that arose during the processing phase, the Census Bureau projects that it will not complete apportionment counts until April 30, 2021. *Id.* ¶ 40. Another court and other parties have even relied upon Defendants' representation that "the Census Bureau will not under any circumstances report the results of the 2020 Census . . .

before April 16, 2021." *Nat'l Urb. League v. Raimondo*, No. 20-cv-05799, ECF No. 465 & 467 (N.D. Cal. Feb. 3, 2020).

The delay in apportionment also means the Secretary and the Census Bureau will miss the statutory deadline (March 31, 2021) to submit census-based redistricting data to the States. 13 U.S.C. § 141(c); Thieme Decl. ¶¶ 40–41. This was not a secret. In a February 12, 2021 Press Release, the Census Bureau explained that "it will deliver the [ ] redistricting data to all states by Sept. 30, 2021" because "COVID-19-related delays and prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021." *Census Bureau Statement on Redistricting Data Timeline*, U.S. Census Bureau (Feb. 12, 2021), available here.

That announcement was not for the Census Bureau's benefit, but for States that use census-based redistricting data to draw their congressional or state election districts. While no federal law requires the use of census data for this purpose, the data is generally utilized as the gold standard, including by the Department of Justice, which uses such data for enforcement of the Voting Rights Act. Whitehorne Decl. ¶ 4. That's why States generally use census data for redistricting. And many of those States make up the 27 States that are bound by their own laws to redistrict in 2021. *See 2020 Census Delays and the Impact on Redistricting*, National Conference of State Legislatures (last visited March 12, 2021), available here. That has led some States under self-imposed redistricting pressure to find workable solutions. In New Jersey, for example, voters approved a constitutional amendment that allowed the State to use previous district maps until the new maps are in effect for the 2023 elections. *See* Whitehorne Decl. ¶¶ 7–8; N.J. Const. art. III, § 3, ¶ 4; *2020 Census Delays and the Impact on Redistricting*, National Conference of State Legislatures (last visited March 12, 2021), available here. And in California, the state legislature sought and obtained at least a four-month delay of the redistricting deadlines from the California Supreme Court. *Legislature of the State of Cal. v. Padilla*, 469 P.3d 405, 413 (Cal. 2020); Whitehorne Decl. ¶¶ 7–8. These States—and many others—gathered information

from the Census Bureau and found a way to remedy their own redistricting issues. Whitehorne Decl. ¶¶ 7–8.

Ohio is not one of those States. Rather than communicating with the Census Bureau or finding its own solution, the State ran to court. *See generally* Compl. ¶¶ 1–61, ECF No. 1. And through its preliminary-injunction motion, Ohio now demands redistricting data that does not exist by a statutory deadline that is impossible to meet. Whitehorne Decl. ¶¶ 12–14. Defendants oppose that motion.

## ARGUMENT

### I.   OHIO LACKS STANDING.

This Court cannot entertain the merits of Ohio's claims until it assures itself that it has authority to do so. Article III of the Constitution limits the judicial power of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To protect the vital, but limited all the same, role of the Judiciary in our system of government, the Constitution makes standing an indispensable ingredient of a judicial dispute." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019). To have standing, "a plaintiff must show that he has 'suffered an injury in fact,' the injury is 'traceable' to the defendant's action, and a favorable decision likely will redress the harm." *Turaani v. Wray*, --- F.3d. ---, 2021 WL 631473, at *1 (6th Cir. Feb. 18, 2021) (quoting *Spokeo*, 136 S. Ct. at 1547); *see also Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020). As the party invoking this Court's jurisdiction, Ohio bears the burden of establishing these requirements. *Spokeo*, 136 S. Ct. at 1547. It has not.

### A.   Ohio's purported injury is not redressable because it is impossible for the Census Bureau to produce redistricting data by March 31.

An injury is redressable only "if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). But a judicial decree is only the means to an end: "At the end of the rainbow lies not a judgment, but some action (or cessation of action)

by the defendant that the judgment produces." *Id.* (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). In other words, "[r]edress is sought *through* the court, but *from* the defendant," and "[t]he real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Id.* (quoting *Hewitt*, 482 U.S. at 761).

Here, Ohio seeks an advisory opinion that cannot redress their claimed injury. *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015) (explaining that "the relief the plaintiff is seeking must provide redress for the injury"); *Brown v. Berhndt*, 12-cv-24-KGB, 2013 WL 1497784, at *5 (E.D. Ark. Apr. 10, 2013) (no standing where "injunctive relief [wa]s impossible"). That's because it is now impossible for the Census Bureau to meet the March 31 statutory deadline for providing census-based redistricting data. As the Census Bureau's long-time head of redistricting explains in his sworn declaration, "producing redistricting data by, or even close to, the statutory deadline of March 31, 2021 is not possible under any scenario, and the Census Bureau would be unable to comply with any such order from the Court." Whitehorne Decl. ¶ 12. "[T]he Census Bureau must complete a series of interim steps prior to delivering the redistricting data," and "[e]ach of these interim steps, in order, is required to move to the next." *Id.* ¶¶ 13–14. Those steps will likely not be completed until September 30, 2021. *Id.* ¶¶ 14–15.

Ohio's purported injury is doubly unredressable when it comes to redistricting for congressional (as opposed to state) elections. In order to draw congressional districts, Ohio must first know the number of Representatives it will have in Congress to know how many districts to draw. 2 U.S.C. § 2c. But the Census Bureau will not finish, and neither the Secretary nor the President will be able to report, the apportionment of Representatives until sometime after the March 31 deadline for redistricting data. *See* Thieme Decl. ¶¶ 40–41. And, at that point, apportionment will be entirely in Congress's hands to accept or reject. *See* 2 U.S.C. § 2a(b) (commanding that apportionment only occurs

"under [2 U.S.C. § 2a] or subsequent statute"). So even if the Court ordered all the relief Ohio seeks in this lawsuit—redistricting data by March 31—Ohio would be no closer to drawing congressional districts on April 1. In such circumstances, redressability (and standing) are lacking. *See Leifert v. Strach*, 404 F. Supp. 3d 973, 982 (M.D.N.C. 2019) (no redressability where "[i]t is not merely speculative, but rather impossible, for the requested relief to remedy the alleged injury"); *Vaduva v. City of Xenia*, 2018 WL 4207100, at *4 (S.D. Ohio Sept. 4, 2018) (Rose, J.) (finding a lack of redressability where plaintiff's requested relief "would be of no consequence"), *aff'd* 780 F. App'x 331 (6th Cir. 2019).

Put simply, Ohio seeks the impossible. But "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167–68 (D.C. Cir. 2017). Indeed, "[i]t has long been settled that a federal court has no authority . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). The Court should therefore reject Ohio's request for an advisory opinion based on the hypothetical world in which the Census Bureau could provide census-based redistricting data by March 31. The Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 167–68; Whithorne Decl. ¶ 12 (explaining that "it would be a physical impossibility" to provide redistricting data by March 31).

## B. Ohio has not established injury in fact or traceability.

Ohio also lacks standing because it has not established injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An injury need not be tangible to be concrete: "intangible injuries premised on statutory violations in some instances may satisfy Article III's injury-in-fact requirement." *Huff*, 923 F.3d at 464. But bare assertion of "a statutory violation in and of itself

is insufficient." *Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017). A litigant is not concretely injured and "standing is not met simply because a statute creates a legal obligation" that goes unfulfilled. *Id.* at 859-60 (collecting cases). To the contrary, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S.Ct., at 1549; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing"). And that "concrete injury" must be "plausibly and clearly allege[d]." *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1620–21 (2020).

Here, Ohio has certainly alleged a statutory, procedural violation. The State claims that the Census Bureau's plan to deliver redistricting data by September 30, 2021 is contrary to the deadlines established in 13 U.S.C. § 141(c). Compl. ¶¶ 1-2. But what harm does Ohio suffer from the delay? By Ohio's own admission, the State does not actually *need* the Census Bureau's data to redistrict. *Id.* ¶¶ 2, 31. Ohio's constitution contemplates ways in which redistricting can be accomplished in the absence of census data. *See* Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2). In particular, the relevant provisions of Ohio's constitution explicitly provide that redistricting shall be based on "the federal decennial census or, *if the federal decennial census is unavailable, another basis* as directed by the general assembly." Ohio Const., art. XIX, § 2(A)(2) (congressional redistricting) (emphasis added); art. XI, §3(A) (state redistricting provision, using similar language); *see also* art. XIX, §§1(D), (E) (providing that "congressional district plan adopted under this division shall be drawn using the federal decennial census data *or other data* on which the previous redistricting was based" (emphasis added)). Notably, none of the elaborate procedures or timelines that the Ohio constitution prescribes for redistricting are affected by the data source that is chosen. *See generally* Ohio Const., art. XIX, §§ 1-3 (congressional redistricting); art. XI, §§ 1-8 (state redistricting); *see also* Compl. ¶¶ 26–31 (describing the process). The "bipartisan, transparent redistricting process," Compl. ¶ 26, that Ohio's voters selected proceeds regardless of which data source is used.

Contrary to Ohio's contention, Compl. ¶ 37, the absence of census data thus does not impede the state from implementing its constitutional scheme or otherwise impinge on its sovereign interests in effectuating its law. *See* PI Mot. at 20-21. Unlike the cases Ohio cites, *e.g.*, *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), no law is being frustrated or rendered invalid by the delay in census data. Nor is there any imposition on Ohio's ability or power "to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). To the contrary, Ohio will be able to follow its state constitutional procedures and conduct its redistricting regardless of when the Census Bureau delivers its data because the state constitution *explicitly contemplates* that census data might be "unavailable"—and provides a mechanism for that contingency. Ohio Const., art. XIX, § 2(A)(2).

To be sure, Ohio contends that the use of census data is "preferred," and that a delay of that data will leave the state no other choice but to use "alternative data sources" that are "a second-best option." Compl. ¶¶ 2, 35. And it is indeed true that, as a general matter, the use of census data for redistricting is good policy—even if it is not explicitly required by any federal statute. The Census Bureau goes to great lengths to ensure that its data is accurate, and various entities, including the Department of Justice's Civil Rights Division, rely on census data to enforce the Voting Rights Act. Whitehorne Decl. XXX.

But Ohio has made *no* allegations along these lines. The State does not, for example, allege that census data is superior to any available alternatives; nor does it contend that the use of census data will result in better districts or enable it to better comply with federal law. *See* Compl. ¶¶ 1-2, 38; PI Mot. at 22. And that is fatal. *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 312 (6th Cir. 2009) (because plaintiff "is the master of the complaint," he must "take responsibility for the allegations included in the complaint"). Alleging a preference untethered from real-world effects is insufficient. *See, e.g.*, *Lujan*, 504 U.S. at 566 ("Standing is not an ingenious academic exercise in the conceivable," but ra-

11

ther requires "a factual showing of perceptible harm" (internal quotes and citation omitted)). To satisfy the injury-in-fact requirement, Ohio must connect the frustration of its purported preference to some "concrete harm[.]" *Spokeo*, 136 S.Ct. at 1549.

The closest Ohio comes to alleging some basis for preferring census data is its bald assertion that the use of non-census data will precipitate "high-stakes debates regarding which data to use and . . . fan[] partisan flames when one data source is eventually chosen, no matter how precise and reliable." Compl. ¶¶ 38, 39. In its motion, Ohio builds on this theory by suggesting that "debates over which data to use are sure to sow distrust in the entire redistricting process." PI Mot. at 22. But these allegations are far afield from any concrete injury. For one thing, predicting what debates will transpire—and what those debates might sow—is an inherently speculative exercise. An alleged future injury must be "*certainly impending*" and cannot rely on a "highly attenuated chain of possibilities"; '"[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) and *Lujan*, 504 U.S. at 565 n.2) (emphasis added); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) ("[I]njury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" (citations omitted)).

Even more fundamentally, it is hard to see how "debates" and passions surrounding a legislative function could be a cognizable form of harm. Public engagement is a virtue—not a fault—of the democratic process, and it cannot be said to impair any kind of state interest. As the Supreme Court has observed in other contexts, "there is *no* significant state or public interest in curtailing debate and discussion [related to] a ballot measure." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) (emphasis added); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("[W]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly

sharp attacks on government and public officials."). The possibility of political debate has, to Defendants' knowledge, never been successfully used as a basis for a state to establish standing. *See, e.g., Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) (identifying state interests which can give rise to standing); *W. Va. ex rel. Morrisey v. United States Dep't of Health & Human Servs.*, 827 F.3d 81, 84 (D.C. Cir. 2016) (rejecting as cognizable "injury [that] is nothing more than the political discomfort in having the responsibility to determine whether to enforce [a legal provision] . . . and thereby annoying some [state] citizens[.]"). Indeed, "no court has ever recognized political discomfort as an injury-in-fact." *Morrisey*, 827 F.3d at 84. Strong feelings and the possibility of lawsuits are simply not Article III injuries. PI Mot. at 22; *see generally Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."). To find otherwise would read concreteness out of Article III's injury-in-fact test. *See generally Huff*, 923 F.3d at 462 ("An injury in fact must be real, not abstract, actual, not theoretical, concrete, not amorphous." (citing *Spokeo*, 136 S.Ct. at 1548)).

Having failed to establish a concrete, cognizable harm, Ohio is left claiming a purely procedural injury—*i.e.* the frustration of its expectation that the Census Bureau will follow the timelines prescribed in 13 U.S.C. § 141(c). *See* Compl. ¶¶ 32, 33, 34. Courts routinely find such procedural injuries insufficient for Article III standing. *See, e.g., Huff*, 923 F.3d at 465–66 (finding no standing where plaintiff could not establish negative consequence from statutory violation); *Lyshe*, 854 F.3d at 860 ("[S]tanding is not met simply because a statute creates a legal obligation and allows a private right of action for failing to fulfil this obligation."). As various Circuits have recently recognized, "an asserted informational injury that causes no adverse effects cannot satisfy Article III." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (citing *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188-89 (D.C. Cir. 2020); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 338 (7th Cir. 2019); *Huff*, 923 F.3d at 467; *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d

13

337, 346–47 (4th Cir. 2017)). That is particularly true here because the Census Act does not provide a cause of action to enforce the statutory deadline for redistricting data, *see* Argument Section II.A.1., *supra*, meaning that Ohio can't rely on a congressional definition of "injuries and . . . chains of causation" to carry part of its burden. *Spokeo*, 136 S. Ct. at 1549 (internal quotes and citation omitted); *see generally Dreher*, 856 F.3d at 346 ("[I]t would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury.").

Ohio fails to establish traceability for similar reasons. "Redistricting is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and "involves choices about the nature of representation with which [courts] have been shown no constitutionally founded reason to interfere," *Burns v. Richardson*, 384 U.S. 73, 92 (1966). While the use of census data is the gold standard and is certainly the general practice, no stricture of the *federal government* requires States to use decennial census data in redistricting, so long as the redistricting complies with the Constitution and the Voting Right Act. *See id.* at 91 ("[T]he Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured."); *e.g.*, *Burns*, 384 U.S. at 92–97 (State may draw districts based on voter-registration data). So any purported injury Ohio may suffer is "fairly . . . trace[able]" to Ohio's independent decision to create a state redistricting timeline with no flexibility to accommodate the COVID-19 pandemic that has resulted in the unique challenges in completing the census this year (as well any decision to use census data under such circumstances), not "the challenged action of the defendant." *Lujan*, 504 U.S. at 560. [1]

---

[1] To be sure, the Supreme Court has stated that an intrastate redistricting injury was traceable to a Census Bureau decision because some States required the use of federal

In very practical terms, Ohio has not established that it cannot actually accomplish its redistricting in the time that remains between the unavoidably delayed results of the 2020 Census and its 2022 elections. The Census Bureau intends to release the decennial redistricting data for the entire country by the end of September 2021. There is every reason believe that Ohio can in fact redraw its districts by the time of its legislative and congressional primary and general elections in 2022 using census data released in September. The fact that the census data is not available to Ohio on the schedule it prefers, simply cannot harm the State if it can still redistrict by the time of its next elections. And if Ohio does not believe it can meet the schedule for redistricting using the census data once it is released, there are alternatives it can pursue until the State can enact a plan.

Because Ohio has not proven any concrete, cognizable harm that is traceable to the Census Bureau's actions, the State fails to establish that "a federal court [should have] business entertaining [its] lawsuit." *Huff*, 923 F.3d at 465.

## II.    OHIO HAS NOT PROVEN THAT IT IS ENTITLED TO A PRELIMINARY INJUNCTION.

Even if Ohio had standing to bring this case, it is not entitled to the "extraordinary and drastic remedy" of a preliminary injunction, which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (internal quotation marks omitted). "Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner*

---

decennial census population numbers for their state legislative redistricting. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332–34 (1999). But that discussion was dicta because the Court had already found Article III standing based on the expected loss of a congressional representative, which involved no independent choices of state governments. *See id.* at 331–32. And, unlike the States in *House of Representatives*, Ohio is not *required* to use decennial census data for redistricting. As discussed above, Ohio law fully contemplates using other redistricting data if census-based redistricting data is "unavailable." *See* Argument Section I.A., *supra*.

*Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019). Where, as here, the government is the defendant, the last two factors merge. *See Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And while the factors may be balanced to an extent, "the existence of an irreparable injury is mandatory" and "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T.*, 942 F.3d at 326–27 (internal quotation marks omitted). Here, Ohio has not established any of the preliminary-injunction factors, and therefore fails to carry its "burden of proving that the circumstances clearly demand" an injunction. *Walther v. Fla. Tile, Inc.*, 3:17-cv-257, 2017 WL 5634246, at *2 (S.D. Ohio Aug. 28, 2017) (Rose, J.) (citation omitted).

### A. Ohio is unlikely to succeed on the merits of its claims.

#### 1. Ohio's Claim Under the Court's "Inherent Equitable Authority" Is Not Likely to Succeed.

While Ohio alleges that Defendants "violate[d] the Census Act," Compl. ¶ 45, the Census Act does not provide a cause of action to pursue equitable relief against the federal government. Recognizing this, Ohio asserts a cause of action under what it calls the Court's "inherent equitable authority," relying on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). *See* PI Mot. at 12–13. But Ohio's reliance on *Armstrong* is misplaced, and it cannot invoke a cause of action "in equity" here for several reasons.

In *Armstrong*, the Court observed in *dictum* that "federal courts may in some circumstances grant injunctive relief against" state and federal officials "who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326–27. But the Court in *Armstrong* also recognized that this "judge-made remedy" is available only in "a proper case." *Armstrong*, 575 U.S. at 327. And nothing in *Armstrong* suggests that a plaintiff may simply bring a claim "in equity" whenever it lacks an express cause of action to pursue an alleged statutory violation. As the Sixth Circuit has held, "legal remedies to enforce federal statutes must stem from the legislatively enacted statute, not from court-created equitable

enforcement actions." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 903 (6th Cir. 2014). Here, Ohio's attempt to pursue a claim "in equity" fails for at least three reasons.

*First*, allowing Ohio to pursue its challenge "in equity" would be inappropriate in these circumstances because Congress has already provided an express mechanism for plaintiffs to challenge federal agency action (and inaction) through the Administrative Procedure Act. "[G]iven the vast number of federal laws, government agencies, and potential legal disputes," Congress enacted the APA to "provide . . . a single uniform method for review of agency action." *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 605 (1st Cir. 1989) (Breyer, J.). Thus, it is the APA that "sets forth the procedures by which federal agencies are accountable to the public to their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). While Ohio is not likely to succeed on its APA claim for the reasons explained below, *see* Argument Section II.A.2, *infra*, Ohio cannot avoid the APA's express requirements by recasting its claim as arising under the Court's "inherent equitable authority." *See Armstrong*, 575 U.S. at 327 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."). Were it otherwise, a plaintiff seeking relief against the United States could always style a claim as one "in equity," and the APA's limitations on judicial review in such cases would be meaningless.[2]

*Second*, the Supreme Court has explained that a court's equitable jurisdiction is limited to relief that "was traditionally accorded by courts of equity." *Grupo Mexicano de*

---

[2] Two of the cases on which Ohio relies, by contrast, involved challenges to action taken by states or localities, where APA review was unavailable. *See Barry v. Lyon*, No. 13-cv-13185, 2015 WL 12838828, at *4 (E.D. Mich. June 5, 2015); *CNSP, Inc. v. City of Santa Fe*, 755 F. App'x 845, 849 (10th Cir. 2019). And while a divided panel of the Ninth Circuit recently concluded that plaintiffs had an equitable cause of action notwithstanding the availability of APA review in *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019), the Supreme Court stayed that decision because the government "ha[d] made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review" of the agency action at issue. *Trump v. Sierra Club*, 140 S. Ct. 1 (2019).

*Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Equitable suits against the government traditionally have been recognized where a party seeks *preemptively to assert a defense* that would otherwise be available to it in an anticipated enforcement action by the government. *See, e.g.*, *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 487, 491 n.2 (2010); *Mich. Corr. Org.*, 774 F.3d at 906 (the "classical[]" type of implied equitable suit "permit[s] potential defendants in legal actions to raise in equity a defense available at law"). Here, by contrast, Ohio seeks to create an affirmative equitable cause of action even though it is not subject to or threatened with any enforcement proceeding.

*Third*, even if Ohio could assert a claim under the Court's "inherent equitable authority," the Court should not exercise its equitable discretion to compel the Census Bureau to produce redistricting data by March 31. As explained further below, Ohio has not demonstrated that Congress intended the March 31 deadline to be mandatory. *See* Argument Section III., *infra*. And as explained above, it is simply not possible for the Census Bureau to provide the redistricting data that Plaintiff requests by March 31, 2021, and it is well established that a court may not exercise its equitable powers to "require an agency to render performance that is impossible." *Am. Hosp. Ass'n*, 867 F.3d at 167. "*Ought* implies *can*," and thus it is elementary that "in order for law . . . to command the performance of an act, that act must be possible to perform." *Id.* at 161. In exercising its equitable authority, "a court must be mindful of the 'budgetary commitments and manpower demands that are required,' and thus avoid imposing deadlines that 'are beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs.'" *Cmty. In-Power & Dev. Ass'n, Inc. v. Pruitt*, 304 F. Supp. 3d 212, 220 (D.D.C. 2018) (quoting *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 712 (D.C. Cir. 1974)). Here, due to a global pandemic and other extraordinary circumstances beyond its control, it is simply not possible for the Census Bureau to provide redistricting data by March 31.

Nor may Ohio avoid the APA's limitations by styling its claim as challenging "*ultra vires*" agency action. *See* PI Mot. 13. Again, Ohio's challenge does not fit within the

18

narrow circumstances where equitable *ultra vires* review is available because Congress has afforded Ohio a separate mechanism to pursue its challenge through the APA. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (rejecting *ultra vires* challenge because statute provided plaintiff "with a meaningful and adequate opportunity for judicial review" of the challenged regulation); *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (agency action is subject to *ultra vires* review only if "there is no alternative procedure for review of the statutory claim"); *Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007) (holding that nonstatutory review was inappropriate where the APA provided plaintiff a cause of action).

Even if *ultra vires* review were available, courts have held that review under that doctrine "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). Among other requirements, plaintiff must show that the agency's error is "so extreme that one may view it as jurisdictional or nearly so." *Id.* (quoting *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Plaintiff cannot make that showing here because the Census Bureau has not willfully violated a statutory deadline, but instead recognized the practical reality that, due to extraordinary events, delivery of redistricting data by March 31 is impossible. And even if Ohio could establish *ultra vires* agency action, injunctive relief would still be inappropriate because, as noted, a court may not exercise its equitable powers to "require an agency to render performance that is impossible." *Am. Hosp. Ass'n*, 867 F.3d at 167.

### 2. Ohio's APA Challenge To The February 12 Press Release Is Not Likely To Succeed.

Ohio is likewise unlikely to succeed under the APA because its claims do not challenge any final agency action. The State's APA claims focus exclusively on a February 12 Press Release and related blog post. PI Mot. at 15 (citing Compl. Exs. 1 & 2). But the Sixth Circuit has recognized that final agency action occurs when the Secretary reports the final

redistricting numbers. *See City of Detroit v. Franklin*, 4 F.3d 1367, 1377 n.6 (6th Cir. 1993). So the Press Release is not final agency action reviewable under the APA.

### a. The February 12 Press Release Was Not Final Agency Action.

For a valid claim under the APA, the agency action at issue must be *final* agency action. *See* 5 U.S.C. § 704. Final agency action "must mark the consummation of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Berry v. Dep't of Labor*, 832 F. 3d 627, 633 (6th Cir. 2016)). A cognizable APA claim must also challenge a "circumscribed, discrete agency action[]"; it cannot advance a "broad programmatic attack" on an agency's operations. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) ("SUWA"). Put differently, the APA does not permit a plaintiff to attack an agency program "consisting of . . . many individual actions" simply by characterizing it as "agency action" under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Ohio satisfies none of the requirements for final agency action.

 *No Consummation of the Decisionmaking Process*. "The agencies' decisionmaking process consummates when they issue a final decision." *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014). "The core question is whether the agency has completed its decisionmaking process." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The APA also does not allow a party to challenge "preliminary, procedural, or intermediate agency action" until the agency completes its final agency action. *See Jama*, 760 F.3d at 497.

The Sixth Circuit, relying on reasoning from the Supreme Court, has already held that final agency action occurs when the Secretary reports the final redistricting numbers. *See Detroit*, 4 F.3d at 1377 n.6. In *Franklin*, the Supreme Court held that there was no final agency action until the President delivered the final apportionment count to Congress. 505 U.S. at 797. The interim steps taken by the Secretary of Commerce and the Bureau

prior to the delivery of the final apportionment numbers were thus tentative and not reviewable. *Id.* Although *Franklin* dealt with apportionment, the Sixth Circuit relied on its reasoning to conclude that "the Secretary's reporting of the [redistricting] counts for these purposes is a final agency action." *Detroit*, 4 F.3d at 1377 n.6. Since reporting of final redistricting data is reviewable final agency action, the tentative actions and decisions leading up to the delivery of the redistricting data are not reviewable under the APA.

Dispositive precedent aside, a Press Release explaining that the Census expects to deliver redistricting data by a certain date did not consummate anything; it simply provided a snapshot in time of the expected delivery date that had shifted over the past year due to many factors, including disruptions from COVID, wildfires, hurricanes, court orders, and issues in data processing. *See Background, supra.* The February 12 Press Release simply updated Census's estimated timeline, and of course, estimates can still change as data processing continues. Whitehorne Decl. ¶¶ 15. The Press Release thus does not reflect any definitive decision at all.

*No Legal Consequences.* The February 12 Press Release is also not final agency action because it did not change any legal rights or have any legal consequences. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638, (D.C. Cir. 2019) (no final agency action where "no direct and appreciable legal consequences" and no party "can rely on it as independently authoritative in any proceeding"). The February 12 Press Release did not change any rights or obligations: the Secretary will deliver redistricting data to the States, including Ohio, when the data becomes available. In other words, the Press Release was "purely informational"; "[c]ompelling no one to do anything," the Press Release "had no binding effect whatsoever—not on the agency and not on" the general public. *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). And, as discussed above, Ohio faces no legal consequences if it does not receive redistricting data by March 31, 2021. *See* Argument Section I.A., *supra.* In fact Ohio faces no legal consequences at all,

regardless of timing, because its own law fully contemplates the use of other data if census-based redistricting data "is unavailable."  PI Mot. at 5 (citing Ohio Const., art. XI, § 3(A) & art. XIX, § 2(A)(2)).

*Improper Programmatic Attack.*  Finally, Ohio's challenge fails the final-agency-action inquiry because it is a "broad programmatic attack" on the Census Bureau's operations, not a "circumscribed, discrete agency action[]."  *SUWA*, 542 U.S. at 61–62.  While "[c]ourts are well-suited to reviewing specific agency decisions," they are "woefully ill-suited [ ] to adjudicate generalized grievances asking [them] to improve an agency's performance or operations."  *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).  But that is exactly what Ohio seeks here.  Because the Census Bureau's data-processing operations are all interdependent and interrelated, *see* Thieme Decl. ¶¶ 5, 38, 41–42; Whitehorne Decl. ¶¶ 13–14, 19, producing redistricting data on a different timeline would require "a sweeping overhaul to the [processing operations], which exceeds the scope of reviewable 'agency action.'"  *NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 422 (D. Md. 2019), *aff'd in part, rev'd on other grounds*, 945 F.3d 183 (4th Cir. 2019).  Indeed, like the Census Bureau's field operations, its data-processing operations "expressly are tied to one another," so altering any of these operations "would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations."  *NAACP v. Bureau of the Census*, 945 F.3d 183, 191 (4th Cir. 2019) (citing *SUWA*, 542 U.S. at 66–67); Thieme Decl. ¶¶ 38, 41–42.  That is "precisely the result that the 'discreteness' requirement of the APA is designed to avoid."  *Id.* (citing *SUWA*, 542 U.S. at 67).

### b.  The February 12 Press Release is not arbitrary or capricious.

While the Census Bureau's inability to deliver the redistricting data by March 31, 2021 is inconsistent with 13 U.S.C. § 141(c), Ohio is unlikely to prove that the Census Bureau is acting arbitrarily or capriciously in violation of the APA.  Where (unlike here)

there is final agency action, "the arbitrary and capricious standard is the least demanding form of judicial review." *Wolf v. Causley Trucking, Inc.*, 719 Fed. Appx. 466, 473 (6th Cir. 2017). "So long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Id.* And "[d]eference to the informed discretion of the responsible federal agencies is especially appropriate, where, as here, the agency's decision involves a high level of technical expertise." *Ranchers Cattlemen Action Legal Fund v. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005).

Here, there is a "reasoned explanation" for the Secretary's inability to transmit redistricting data by the statutory deadline: "Producing redistricting data by, or even close to, the statutory deadline of March 31, 2021 is not possible under any scenario." Whitehorne Decl. ¶ 12; *cf.* Compl. Ex. 1. Nor can the Bureau's delivering redistricting data for all States at once be considered arbitrary or capricious: even if the Census Bureau prioritized Plaintiff's redistricting data to the detriment of the other 49 States, "it would not be able to deliver the data more than a few weeks earlier than a national release"; "[t]he resulting data may have uncaught errors or anomalies from [having] been rushed through review without the benefit of other states having also been reviewed"; and it would "delay the release of data for the other 49 states." Whitehorne Decl. ¶¶ 26–27.

Finally, even assuming that the February 12 Press Release could be considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the only remedy would be to "set [it] aside" and "remand [it] to the agency for additional investigation." 5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Indeed, under the APA § 706(2), "it is not a court's role to direct the agency how to act. Rather, a court's role is to review the agency's decision and, if it cannot be sustained, remand to the agency." *Neto v. Thompson*, 2020 WL 7310636, at *11 (D.N.J. Dec. 10, 2020) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907–08 (2020)). And while the Census Bureau would take any such remand seriously, it would

not change the fact that "[p]roducing redistricting data by, or even close to, the statutory deadline of March 31, 2021" would be impossible. Whitehorne Decl. ¶ 12.[3]

### B. Ohio will suffer no harm, much less irreparable harm.

Regardless of the merits of its claims, Ohio cannot obtain an injunction without establishing that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. This showing is not optional: "although the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory." *Sumner Cty. Sch.*, 942 F.3d at 327. And because a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), Ohio's burden to show irreparable harm is necessarily higher than what is required to establish standing. *See, e.g.*, *Mazurek*, 520 U.S. at 972. Yet Ohio fails this test for all the same reasons it fails to establish standing: the State fails to establish that it will suffer any injury *at all*. Ohio's claim to harm rests entirely on an assertion that it will be unable to comply with state law, but Ohio's constitution expressly contemplates the use of non-census data for redistricting when census data is "unavailable," so the absence of census data does not interfere with Ohio's constitutional scheme or its sovereign interests. *See* Argument Section I.A., *supra*.

The cases Ohio cites confirm that it does not stand to suffer any injury. *See* PI Mot. at 20-21. In each of those cases, some portion of state law was enjoined or invalidated, precluding the state from enforcing its provisions. *See Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers); *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020). The hypothetical posed by Ohio—a court

---

[3] Contrary to Ohio's protestations, the Census Bureau *did* consider States' self-imposed reliance on census-based redistricting data. Mot. at 18; *see also* Mot. at 19. Indeed, Ohio acknowledges as much. *See* Mot. at 18; *see also* Compl. Ex. 2 (Census Bureau explaining that "[w]e are acutely aware of the difficulties that this delayed delivery of the redistricting data will cause some states"). And, "[w]ith the delay in the delivery of the redistricting data, there are now too many states (at least 27[]) to prioritize, in a fair, logical, and data-driven manner." Whithorne Decl. ¶ 24.

injunction preventing the use of otherwise available census data—might bear some superficial similarity to those cases, particularly *if* Ohio's constitution did not contemplate an alternative data source. Pl. Mot. at 21. But here, the census data is "unavailable," exactly as Ohio's constitution contemplates it might be. Ohio Const., art. XIX, § 2(A)(2). So the realization of a circumstance expressly accounted for in the constitutional text is not a frustration of that text or its purpose. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (courts "must presume that [the] legislature says in a statute what it means and means in a statute what is says there.").

Likewise, Ohio cannot claim irreparable injury from the mere possibility that the absence of census data will inflame passions or spur lawsuits. Pl. Mot. at 22. Neither debate nor litigation constitutes irreparable injury—to the contrary, courts have recognized that irreparable injury can come from the *frustration* of public debate. *See, e.g.*, *Ctr. for Pub. Integrity v. United States Dep't of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019). And the mere possibility of debate or lawsuits is too speculative to satisfy the demanding standards for obtaining a preliminary injunction in any event. *See Winter*, 555 U.S. at 22.

Ohio may well prefer to use census data for redistricting, but are frustration of an alleged preference, without a factual showing of likely real-world effects, is insufficient to constitute an irreparable injury. *Cf. Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) ("Although plaintiff's desire to have its case decided in an expedited fashion is understandable, that desire, without more, is insufficient to constitute the irreparable harm[.]"). Were it otherwise, anyone that came to court with a preference for different census operations could obtain an injunction as a matter of course. That is not—and cannot be—the standard. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." (citation and internal quotation marks omitted)).

### C.     Defendants and the public would be harmed by an injunction.

On the other side of the ledger, the harm to the government and to the public from an injunction would be great and immediate. *See Nken*, 556 U.S. at 435 (harm to opposing party and the public interest "merge" when relief is sought against the government). As explained above, the injunction would be largely, if not wholly, impossible to implement because the Census Bureau lacks the ability to produce the redistricting data on the time-line Ohio wants. Whitehorne Decl. ¶¶ 12–15, 19; *see* Argument Section I.C., *supra*. The Census Bureau's current schedule reflects the minimum amount of time the Bureau has concluded it needs to complete the myriad of complex steps required to finish processing the various sources of data it received; verifying the quality of its tabulations; and pre-paring usable, accurate outputs that comply with statutory requirements for respondent privacy protection. Whitehorne Decl. ¶¶ 18–19, 25–28; Thieme Decl. ¶¶ 63–85 (detailing the steps that still need to be accomplished to deliver redistricting data). An order requir-ing the Census Bureau to nonetheless attempt to deliver data faster would yet again dis-rupt census operations, reduce the time for data quality checks, and make it even *more* difficult for the Census Bureau to complete its work. Whitehorne Decl. ¶¶ 26–28; Thieme Decl. ¶¶ 67, 72, 76–77, 81, 85.

The harm from such a disruption would reverberate to other states and the public at large. If the Census Bureau were required to prioritize Ohio's data, it may well have to delay delivery of other states' data until past September 30, 2021. Whitehorne Decl. ¶¶ 27, 28. Such a delay would disrupt those other States' redistricting plans—presuma-bly leading those States to suffer the same kinds of harms Ohio alleges in this lawsuit. Already, at least one other state has brought a lawsuit like Ohio's, requesting that its data be prioritized over those of other states. *See Alabama, et al., v. Raimondo, et al.*, Case No. 21-cv-211, ECF No. 1 (M.D. Ala.). Meanwhile, plaintiffs in California continue to assert that data-processing operations should not be cut short. *See Nat'l Urb. League v. Raimondo*,

No. 20-cv-0577, ECF No. 465 & 467 (N.D. Cal. Feb. 3, 2020). The more courts intrude on census operations, the more entities will want to seek judicial intervention on their behalf.

Managing census operations through competing court orders is untenable. Census operations are interrelated. Whitehorne Decl. ¶¶ 13-14. "Setting aside one or more of these choices necessarily would impact the efficacy of the others, and inevitably would lead to court involvement in hands-on management of the Census Bureau's operations." *NAACP v. Bureau of the Census*, 945 F.3d 183, 191 (4th Cir. 2019) (internal quotes and citation omitted). Court intervention in the carefully calibrated operations of the census will only upend the process.

A better course is available. For one, States have the ability to alleviate any injury they may suffer from the redistricting-data delay by working cooperatively with the Census Bureau and by taking action on the relevant state deadlines. *See* Background Section, *supra* (explaining that New Jersey and California did so). More importantly, a senator has announced that legislation providing a statutory extension is about to be introduced in Congress. *See* Office of Senator Schatz, *Schatz, Murkowski, Sullivan Set To Reintroduce Bill To Extend Key Deadlines For 2020 Census, Ensure Accurate Count* (Feb. 12, 2021), available here. The hard work of accounting for broad and competing interests related to the census can thus be taken up by the branch of government best suited to—and, indeed, constitutionally charged with—balancing those interests. That, in fact, is what has been done historically. Throughout the nation's history, census deadlines were repeatedly codified and amended when unmanageable—including in every census from 1810 to 1850. *See infra* n.4. Congress is more than capable of doing so again. The extraordinary remedy of an injunction, by contrast, would work a tremendous disservice to the Census Bureau, other states, and the public. *Romero–Barcelo*, 456 U.S., at 312, 102 S.Ct. 1798 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

III.　**MANDAMUS RELIEF IS UNAVAILABLE.**

In three short paragraphs, Ohio argues that it is entitled to mandamus relief pursuant to the Mandamus Act, 28 U.S.C. § 1361. *See* PI Mot. at 24–25. Ohio is wrong.

"The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 491 (6th Cir. 2011) (internal quotation and alteration marks omitted). "Mandamus is available only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Id.* (internal quotation marks omitted). And "[e]ven when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (internal quotation marks omitted); PI Mot. at 25 ("The court must also assure itself 'that the writ is appropriate under the circumstances.'") (quoting *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 381 (2004)). Ohio is not entitled to mandamus relief for two independent reasons.

For starters, Ohio has not demonstrated a clear, mandatory duty that would afford it with a clear right to relief because "it is anything but clear that Congress intended the deadline[] at issue to be mandatory rather than directory." *Friends of Aquifer, Inc. v. Mineta*, 150 F. Supp. 2d 1297, 1300 (N.D. Fla. 2001). "[I]n order to establish either jurisdiction or entitlement to" mandamus relief, "a court must find," *inter alia*, "that a duty is owed to the plaintiff." *Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir. 1987). And—crucially—"[f]or there to be a 'duty owed to the plaintiff' within the meaning of section 1361, there must be a mandatory or ministerial obligation. If the alleged duty is discretionary or directory, the duty is not 'owed.'" *Id.* (internal quotation marks omitted). To be sure, as Ohio points out, *see* Pl. Mot. at 10, "the word 'shall' *usually* connotes a requirement." *Kingdomeware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) (emphasis added). But, as the Supreme Court expressly noted, that is not always the case, and it is not the case here.

The *Friends of Aquifer* case is directly on point. That case concerned the Pipeline Safety Act, which provided in part that the Secretary of Transportation "'shall prescribe standards'" relating to certain hazardous liquid pipeline facilities by various dates certain. 150 F. Supp. 2d at 1298–99 (quoting Pipeline Safety Act). The Secretary allegedly did not discharge his statutory duties in that regard, and the plaintiff sought mandamus relief. *See id.* at 1298. Citing several cases, the court explained that "in a variety of contexts, courts have concluded that Congress's use of the word 'shall' in directing the discharge of a specified duty does not require that the statute be construed as mandatory rather than directory." *Id.* at 1300. The court noted that, like § 141(c) here, the Pipeline Safety Act neither imposed any "penalty or sanction for the Secretary's failure to prescribe the requisite standards by the specified dates," nor did it include any provision affording jurisdiction to plaintiffs "to compel the Secretary to prescribe certain standards required under the Act." *Id.* at 1299–1300. Finding no "clear mandate from Congress that it intended the statutory deadlines at issue to be something other than directory, and absent a showing that Congress intended a clear right in Plaintiff to the relief sought," the court declined to "exercise its equitable powers to order the Secretary to issue standards that are dependent upon technological complexities and developments that are peculiarly within the agency's—not th[at] court's—expertise." *Id.* at 1301.

The same analysis applies here. Ohio has not demonstrated any "clear mandate from Congress," *id.*, that it intended the § 141(c) deadline to be mandatory rather than directory. To the contrary, there are no statutory consequences for missing the deadline, and historical practice supports the conclusion that census deadlines are directory in nature. And, like the *Friends of Aquifer* court, this Court should decline to "exercise its equitable powers" to order Defendants to rush the processing of the data Ohio seeks, which work is similarly "dependent upon technological complexities and developments that are peculiarly within" the Census Bureau's expertise. *See Friends of Aquifer*, 150 F. Supp. 2d at 1301; *see also, e.g.*, *Robertson v. Attorney General of U.S.*, 957 F. Supp. 1035, 1037 (N.D. Ill.

1997) (finding statutory deadline to be directory and declining to issue mandamus relief; "In order to achieve the goals of the statute, the Attorney General and INS may have to engage in lengthy investigations to determine the validity of a given marriage.").[4]

Moreover, Ohio is not entitled to mandamus relief because, as explained above, the relief it seeks is impossible to provide. "[T]he writ of mandamus will not issue to compel the performance of that which cannot legally be accomplished." *Am. Hosp. Ass'n*, 867 F.3d at 167. "[P]ossibility is a necessary and antecedent condition for the writ's issuance." *Id.* at 169 (collecting sources); *see* 52 Am. Jur. 2d § 24 ("Mandamus will not issue if the performance of the requested action is impossible"); 55 C.J.S. Mandamus § 19 ("The writ of mandamus will not lie where performance of the duty is impossible."). Simply put, this Court "may not require" the Census Bureau "to render performance that is impossible." *Am. Hosp. Ass'n*, 867 F.3d at 167. So Ohio's request must be denied.

## CONCLUSION

For the reasons explained above, Ohio's motion should be denied.

---

[4] Historical practice demonstrates that Congress considers census deadlines as directory. From the very first census, deadlines were missed for various reasons, but Congress either retroactively revised the statute to accommodate the late submission, or simply ignored that a deadline was missed. *See* An Act granting further Time for making Return of the Enumeration of the Inhabitants in the District of South Carolina, 1 Stat. 226 (1791). Congress likewise extended census deadlines throughout the 1800s whenever they were missed. *See* An Act to Extend the Time for Completing the Third Census, 2 Stat. 658 (1811); An Act to Amend the Act Entitled "An Act to Provide for Taking the Fourth Census," 3 Stat. 643 (1821), An Act to Amend the Act for Taking the Fifth Census, 4 Stat. 439 (1831), An Act to Amend the Act Entitled "An Act to Provide for Taking the Sixth Census," 5 Stat. 452 (1841), An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and Subsequent Censuses," 9 Stat. 445 (1850).

DATED: March 12, 2021                            Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
ZACHARY A. AVALLONE
ELLIOTT M. DAVIS
STEPHEN EHRLICH
JOHN ROBINSON
ALEXANDER V. SVERDLOV
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-9803
E-mail: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*