# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

|                                                         |   |                                  |
| ------------------------------------------------------- | - | -------------------------------- |
| STATE OF OHIO,                                          | : |                                  |
|      *Plaintiff,*              | : |                                  |
|                                                         | : | Case No. 3:21-cv-64              |
| v.                                                      | : |                                  |
|                                                         | : | District Judge Thomas M. Rose    |
| GINA RAIMONDO, in her official                          | : |                                  |
| capacity as Secretary of Commerce;                      | : |                                  |
| U.S. DEPARTMENT OF                                      | : |                                  |
| COMMERCE; RON S. JARMIN, in                             | : |                                  |
| his official capacity as Acting                         | : |                                  |
| Director of the U.S. Census Bureau;                     | : |                                  |
| and U.S. CENSUS BUREAU,                                 | : |                                  |
|      *Defendants.*             | : |                                  |
|                                                         | : |                                  |

---

## REPLY IN SUPPORT OF COMBINED MOTION FOR A PRELIMINARY INJUNCTION AND PETITION FOR A WRIT OF MANDAMUS

---

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES .......................................................................... ii

I.     Ohio has standing to sue. .................................................................. 3

II.    Ohio is entitled to an injunction. ...................................................... 9

    A.     Ohio is likely to prevail on the merits. ..................................... 9

        1.     Ohio is entitled to relief under the APA. ........................... 9

           a.   The February 12 Decision is a final agency action. .................... 9

           b.   Ohio will prevail on the merits of its APA claim. ..................... 13

        2.     This Court can enjoin the February 12 Decision under its inherent equitable authority if APA review is unavailable. ........... 15

    B.     Ohio satisfied the other factors for a preliminary injunction.............. 17

III.   The Court may award mandamus relief in the alternative. ...................... 20

CONCLUSION .............................................................................................. 20

CERTIFICATE OF SERVICE ...................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ................................................................................. 4

*ACLU of Ky. v. McCreary Cnty.,*
607 F.3d 439 (6th Cir. 2010) ....................................................................... 5

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) ................................................................. 10

*Armstrong v. Exceptional Child Ctr.,*
575 U.S. 320 (2015) ............................................................................ 15, 16

*Buck v. Gordon,*
429 F. Supp. 3d 447 (W.D. Mich. 2019) ................................................... 19

*Cal. Cmtys. Against Toxics v. EPA,*
934 F.3d 627 (D.C. Cir. 2019) ................................................................... 12

*City of Detroit v. Secretary of Commerce,*
4 F.3d 1367 (6th Cir. 1993) ................................................................. 10, 11

*Coal. to Defend Affirmative Action v. Granholm,*
473 F.3d 237 (6th Cir. 2006) ............................................................... 17, 18

*Dep't of Com. v. U.S. House of Representatives,*
525 U.S. 316 (1999) ......................................................................... 4, 8, 11

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) ..................................................................... 4, 8, 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ............................................................................... 15

*Env't Def. Fund v. EPA,*
852 F.2d 1316 (1988) ................................................................................. 20

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,*
543 F.3d 586 (9th Cir. 2008) ..................................................................... 10

*FEC v. Akins,*
524 U.S. 11 (1998) ....................................................................................... 6

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................................. 11

*John Doe, Inc. v. DEA,*
484 F.3d 561 (D.C. Cir. 2007) .................................................................. 14

*Martin v. Wilks,*
490 U.S. 755 (1989) ................................................................................. 19

*Michigan v. EPA,*
576 U.S. 743 (2015) ................................................................................. 14

*NAACP v. Bureau of the Census,*
399 F. Supp. 3d 406 (D. Md. 2019) .................................................... 12, 13

*New York City v. U.S. Dep't of Com.,*
822 F. Supp. 906 (E.D.N.Y. 1993) ........................................................... 11

*Osborn v. President, Dirs. & Co. of Bank,*
9 Wheat. 738 (1824) ................................................................................. 16

*Richmond Health Facilities v. Nichols,*
811 F.3d 192 (6th Cir. 2016) ...................................................................... 5

*Sackett v. EPA,*
566 U.S. 120 (2012) ................................................................................... 9

*Sierra Club v. Trump,*
929 F.3d 670 (9th Cir. 2019) .................................................................... 17

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016) ............................................................................ 3, 6

*Thompson v. DeWine,*
959 F.3d 804 (6th Cir. 2020) ...................................................................... 4

*Trump v. Sierra Club,*
140 S. Ct. 1 (2019) .................................................................................... 17

*Trump v. Vance,*
140 S. Ct. 2412 (2020) ............................................................................... 2

*U.S. Army Corps of Eng'rs v. Hawkes, Co.,*
136 S. Ct. 1807 (2016) ......................................................................... 10, 12

*U.S. House of Representatives v. Dep't of Com.,*
11 F. Supp. 2d 76 (D.D.C. 1998) ............................................................... 6

iii

*Union Pac. R.R. v. Dep't of Homeland Sec.*,
    738 F.3d 885 (8th Cir. 2013) .................................................................... 14

*United States v. Carriger*,
    541 F.2d 545 (6th Cir. 1976) ..................................................................... 2

**Statutes and Constitutional Provisions**

Ohio Const. art. XI, §3 .................................................................................. 3

Ohio Const. art. XIX, §2 ............................................................................... 3

5 U.S.C. §706 ..................................................................................... 1, 13, 14

13 U.S.C. §141 ................................................................................... *passim*

**Other Authorities**

Application for a Stay, *Ross v. Nat'l Urban League*, 20A62 (U.S., Oct. 7,
    2020) ................................................................................................... 3, 7, 8

Decl. of Albert E. Fontenot, Jr., *Nat'l Urban League v. Ross*, 20-cv-
    05799, Doc.81-1 (N.D. Cal., Sept. 4, 2020) ............................................. 7

Defs.' Notice of Mot. to Dismiss Second Amend. Compl. and Memo in
    Support, *Nat'l Urban League v. Ross*, 20-cv-05799, Doc.354 (N.D.
    Cal., Nov. 11, 2020) ................................................................................. 2

James Whitehorne, *Timeline for Releasing Data*, U.S. CENSUS BUREAU
    (Feb. 12, 2021) ...................................................................................... 10

Michael W. McConnell, *The President Who Would Not Be King* (2020) ...................... 2

*Press Release: Census Bureau Statement on Redistricting Data
    Timeline*, U.S. CENSUS BUREAU (Feb. 12, 2021) ..................................... 1

Recall what this case is about. The Census Act mandates that the Secretary of Commerce "shall," by March 31, 2021, provide the States with information needed for redistricting. 13 U.S.C. §141(c). Yet the Census Bureau, in its "February 12 Decision," determined that it would not comply with that deadline. Allegedly owing to "COVID-19-related shifts in data collection and in the data processing schedule," it would "deliver" the redistricting data "to all states by Sept. 30, 2021." *Press Release: Census Bureau Statement on Redistricting Data Timeline*, U.S. CENSUS BUREAU (Feb. 12, 2021) (Complt., Ex. 2). The Bureau further determined that, instead of giving the data to States on a rolling basis, as it had done in the past, it would release the data to "all states at once." *Id.*

The February 12 Decision is illegal. Delaying the release of redistricting data beyond March 31 violates the Census Act, and therefore the APA. 13 U.S.C. §141(c); 5 U.S.C. §706(2)(A). And the decision to release the States' data all at once, rather than on a rolling basis, is arbitrary and capricious, also in violation of the APA. §706(2)(A). The Court should enjoin the February 12 Decision. There are many ways to do so. The Court *could* enjoin the Secretary from delaying the release beyond March 31. Or the Court could enjoin any delay beyond some later date that is still early enough to accommodate Ohio's needs. Ohio proposes one such date below: three months after the release of apportionment data.

The defendants raise numerous counterarguments, each unpersuasive. But before getting to the particulars, it is important to say something about the Executive-Branch exceptionalism that pervades the defendants' brief. "In our system of

1

government, … no one is above the law." *Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020) (Kavanaugh, J., concurring). That includes Executive Branch officials. *Id*. Thus, the defendants' primary argument—that it is just too hard to compile the re-districting data by the congressionally mandated deadline—is unavailing. In the Revolution, the American people won their independence from a government in which the Executive could "suspend the legal force of a law" and "exempt certain people or entities from the obligation to follow the law." Michael W. McConnell, *The President Who Would Not Be King* 115 (2020). They established a government of laws and not of men. That system is "imperiled" if "government officials" are not required to "observe the law scrupulously." *United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976) (quoting *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting)). Yet if the defendants are right, the Bureau will *never* have to observe the Census Act's deadlines. As the defendants candidly acknowledge, "the COVID-19 pandemic" is but one example of the complications that "*unavoidably* arise" during *every* decennial census. Resp.1 (emphasis added). So the defendants' it's-just-too-hard argument, if accepted, will permit them to ig-nore deadlines for every future census.

Just a few months ago, the defendants themselves argued *against* so lawless an outcome. They told the Northern District of California that the Census Bureau "cannot lawfully" implement a data reporting timeline that exceeds Congress's deadlines. Defs.' Notice of Mot. to Dismiss Second Amend. Compl. and Memo in Support at 14, *Nat'l Urban League v. Ross*, 20-cv-05799, Doc.354 (N.D. Cal., Nov.

2

11, 2020). And they told the Supreme Court that delay would "underline(violate the govern-
ing statute)" (the emphasis is theirs). Application for a Stay at 5, *Ross v. Nat'l Ur-
ban League*, 20A62 (U.S., Oct. 7, 2020), https://tinyurl.com/RossStayApp. Even if
speed compromises accuracy, they explained, "assessing any tradeoff between speed
and accuracy is a job for Congress." *Id.* That is exactly right, and yet exactly the
opposite of what the defendants are arguing in this Court.

## I.  Ohio has standing to sue.

A plaintiff, to prove Article III standing, must show that it "(1) suffered
an injury in fact, (2) that is fairly traceable to the challenged conduct of the defend-
ant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,
Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Ohio satisfies each element.

*Injury in fact.* The State's injury follows from three aspects of Ohio's Con-
stitution. *First*, the Constitution strictly requires the Ohio Redistricting Commis-
sion to draw state legislative maps by September 1. *Second*, the Constitution gives
the General Assembly until September 30 to finalize a *congressional* map—if the
legilsature fails to do so, the Ohio Redistricting Commission takes over. *Finally*,
and this is critical, the Constitution *requires* the Ohio Redistricting Commission
and the General Assembly to draw maps using census data. *Only if* the census data
is "unavailable" may they use other data, determined by the General Assembly, as a
second-best option. Ohio Const. art. XI, §3(A), art. XIX, §2(A)(2). From this, it fol-
lows that the February 12 Decision will irreparably harm Ohio: by delaying the re-
lease of redistricting data until September 30, the February 12 Decision makes it

3

impossible for the State to undertake redistricting in the constitutionally preferred manner. When the federal government interferes with the orderly operation of state law, it imposes irreparable harm. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020).

The defendants contend that Ohio will suffer no harm at all—irreparable or otherwise—because the state constitution permits the use of alternative data. Resp.10. The Court should reject that argument. Preventing Ohio from conducting its redistricting process with census data causes *exactly* the same harm as would an injunction forbidding the State from using census data during redistricting and requiring the State to instead use the backup option. An injunction along those lines would inarguably constitute irreparable harm. *Abbott*, 138 S. Ct. at 2324; *Thompson*, 959 F.3d at 812. Surely the defendants would agree that an injunction forbidding the Census Bureau from conducting the census in one manner—by asking about citizenship, perhaps, *see Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)—would cause the Bureau irreparable harm notwithstanding the availability of other options for conducting the census. The same logic requires finding irreparable harm here, notwithstanding the State's alternative options for redistricting.

What is more, the Supreme Court has already recognized that States have standing to challenge the government's handling of redistricting data. *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332–33 (1999). The defendants call this recognition *dicta*, since "the Court had already found Article III standing" on other grounds. Resp.14–15 n.1. On any fair reading, it is an alternative holding—a

4

legally sufficient basis for reaching the same conclusion, *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 202 (6th Cir. 2016)—not *dicta*.  Regardless, "[l]ower courts are obligated to follow Supreme Court dicta" absent a "substantial reason for disregarding it."  *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 447 (6th Cir. 2010) (quotation omitted).

The February 12 Decision injures Ohio in other ways, too.  Most obviously, it will undermine the public's confidence in Ohio's redistricting process.  The February 12 Decision came so late in the process that it ensured any debate about which data to use would occur in the immediate run-up to redistricting.  The inevitable result will be high-stakes fights that politicize the entire process.  The defendants' let-them-eat-cake response is that the State should in fact be grateful for the delay, as it will spur "[p]ublic engagement" that is a "virtue" of "the democratic process."  Resp.12.  Debate *is* good.  But *forcing* Ohio to debate which data to use right before redistricting is to occur—when the likely beneficiaries of any chosen data set will be easier to predict—is not good.  Representative government requires that citizens have faith in the fairness of elections.  Forcing the State to have the debate so close to the redistricting process undermines that interest.  What is more, any delay that prevents Ohio from using census data—which the Bureau calls the "gold standard" and which is used "to enforce the Voting Rights Act," Resp.6, 11—will inevitably spark expensive, time-consuming litigation about the data used instead.  While the "mere possibility of … lawsuits is too speculative" to be an injury in fact, Resp.25, litigation on *this* issue would be a certainty.  Mem. in Support 22–23.

5

The February 12 Decision causes two additional forms of injury. *First*, withholding data to which Ohio is entitled until it is too late to use that data causes an "informational injury." *U.S. House of Representatives v. Dep't of Com.*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998). Withholding information to which a party has a statutory right causes an injury for Article III purposes. *Id*; *see FEC v. Akins*, 524 U.S. 11, 19 (1998)). *Second*, the failure to timely release the data causes the same sort of injury that creates standing in a breach-of-contract case. The Census Act envisions a sort of agreement between the States and the federal government: the States submit "plan[s] identifying the geographic areas for which specific tabulations are desired," and the Secretary of Commerce, if she approves the plan, provides redistricting data consistent with the plan "within one year after the decennial census date." 13 U.S.C. §141(c). By shirking their obligations, the defendants injured Ohio.

**Traceability**. Since the February 12 Decision will cause the just-discussed harms, those harms are "fairly traceable to the challenged conduct." *Spokeo*, 136 S. Ct. at 1547.

**Redressability**. The defendants additionally claim that the State's injury is not redressable "because it is now impossible for the Census Bureau to meet the March 31 statutory deadline." Resp.8. This argument fails for three reasons.

*First*, and most significantly, the State did not limit its request for injunctive relief to a request that it receive the data by March 31. Instead, it specifically requested a tailored injunction "enjoining the Secretary from delaying the release of the data beyond a date this Court deems equitable and reasonable under all the cir-

cumstances." Mem. in Support 24; *accord* Compl. ¶61.c.  Here is one such alternative deadline:  At the very latest, the Secretary should give Ohio its redistricting data within three months after the apportionment count has been submitted, which the Bureau says will occur by April 30.  Resp.5.  The Census Act requires the Bureau to share the redistricting data by March 31, *see* §141(c), giving the Census Bureau three months to process that data after the apportionment figures are due on December 31, §141(b).  Congress has thus determined that three months post-apportionment is time enough to compile accurate redistricting data.  Nothing in the defendants' brief suggests otherwise.  Indeed, they do not respond *at all* to the State's alternative request for a post-March 31 deadline, waiving their right to do so.  While they submitted two declarations loaded with overly technical descriptions of the data-compilation process, those declarations give this Court no reason to suspect that three months post-apportionment—the same period that Congress set and with which the defendants have complied before—would be inadequate time.

*Second*, the defendants' assertions of impossibility are not credible.  The same defendants, when they needed to do so to win a case last fall, submitted declaration that stated:  "the Census Bureau is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline," which was December 31.  Decl. of Albert E. Fontenot, Jr. ¶91, *Nat'l Urban League v. Ross*, 20-cv-05799, Doc.81-1 (N.D. Cal., Sept. 4, 2020).  The defendants made the same representation to the Supreme Court.  *See* Stay Application at 13–14, *Ross*, 20A62, https://tinyurl.com/RossStayApp.  Of course, the agency long ago missed

that deadline.  It seems as though the federal government is developing facts to support legal theories, not developing legal theories based on the facts.  The *amici curiae*, in an attempt to help the defendants, bolster the point.  They cherry-pick assertions from officials at the Bureau—some dating back to July 2020—insisting that the job could never be completed in time.  *Amici* Br. 7.  What *amici* fail to note are the just-discussed contrary statements contained in declarations filed in court—declarations that the defendants relied on to win relief at the Supreme Court.  *See* Stay Application at 13–14, *Ross*, 20A62, https://tinyurl.com/RossStayApp.  In sum, the Bureau's views on what is possible are constantly evolving.  While the government is entitled to a presumption of regularity, judges "are 'not required to exhibit a naiveté from which ordinary citizens are free.'"  *Dep't of Com.*, 139 S. Ct. at 2575 (quotation omitted).  One cannot help but wonder:  Are the Bureau's predictions colored, perhaps in good faith, by the policy preferences and political needs of the moment?  "If judicial review is to be more than an empty ritual, it must demand something better than" made-for-litigation assurances.  *Id.* at 2576.

*Third*, it is irrelevant that, because Ohio cannot do *congressional* redistricting until it has apportionment data, and because that data will not be released until April, giving Ohio the redistricting data will not redress its injury "when it comes to redistricting for congressional (as opposed to state) elections."  Resp. 8.  Apportionment figures will not impact the number of *state* legislative seats, as the defendants concede.  Resp. 8.  So Ohio can start drawing *state* legislative districts once it has redistricting data, even without apportionment results.

## II.     Ohio is entitled to an injunction.

### A. Ohio is likely to prevail on the merits.

The February 12 Decision violates the Census Act and the APA.  The defend-ants dedicate relatively little energy to arguing otherwise.  Instead, they insist this Court is powerless to stop them and that they must be allowed to continue breaking the law.  The defendants are wrong:  this Court, exercising either its power under the APA or its inherent equitable authority, may enjoin the Secretary from delaying the release of the data beyond March 31 or some other, future date.

### 1.  Ohio is entitled to relief under the APA.

The defendants make two categories of arguments against the State's APA challenge.  First, they argue that the February 12 Decision is not a "final agency ac-tion" challengeable under the APA.  Second, they argue that the February 12 Deci-sion complies with the APA.  The Court should reject both arguments.

### a.  The February 12 Decision is a final agency action.

The defendants say the February 12 Decision is not a final action reviewable under the APA because it was:  (1) an interim step, (2) of no real consequence, and (3) not circumscribed or discrete.  Wrong, wrong, and wrong again.

***Interim step.***  The February 12 Decision is "final" for purposes of the APA because it reflects the "consummation of the Agency's decisionmaking process." *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (internal quotations and citations omitted).  Specifically, the Decision definitively concludes that the defendants will not comply with 13 U.S.C. §141(c).  The defendants insist otherwise; they say the Decision is merely a "snapshot" and an "estimated timeline" subject to change.  Resp.21.  But

9

there is no indication that the Decision will be "revisited," *U.S. Army Corps of Eng'rs v. Hawkes, Co.*, 136 S. Ct. 1807, 1814 (2016), or that "further agency decisionmaking on th[e] issue can be expected," *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008). The Census Bureau itself describes the September 30th schedule as final. *See* James Whitehorne, *Timeline for Releasing Data*, U.S. CENSUS BUREAU (Feb. 12, 2021) (Complt. Ex. 2) ("[W]e have been able to finalize a schedule for the redistricting data."). A declaration that the defendants submitted with their response brief confirms that the agency considers itself bound by the deadlines the February 12 Decision imposes, *see* Thieme Decl. pp. 10–23, meaning the decision is "controlling in the field," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020–21 (D.C. Cir. 2000). Finally, the defendants' main line of defense in this proceeding is that the Bureau *cannot possibly* comply with the March 31 deadline—they say so over and over again. They cannot claim in one breath that the March 31 deadline is literally impossible to meet, while in the next breath expressing openness to that deadline.

*City of Detroit v. Secretary of Commerce*, 4 F.3d 1367 (6th Cir. 1993), is not to the contrary. Indeed, that case, if anything, *confirms* the finality of the February 12 Decision. *Detroit* involved an APA challenge to the Secretary of Commerce's refusal to adjust and re-report census numbers. *Id.* at 1377–78. The Sixth Circuit considered the APA challenge to that refusal, and thus implicitly deemed the action "final." And that supports finality here: the Secretary's refusal to adjust and re-report numbers in *Detroit* was just as final as the Secretary's decision not to comply

10

with the March 31 deadline here—both constituted definitive decisions to refrain from conduct and both affected the challenging parties. *See also New York City v. U.S. Dep't of Com.*, 822 F. Supp. 906, 918–19 (E.D.N.Y. 1993).

In a footnote, *Detroit* explained that Secretaries of Commerce take "final agency action" when they transmit redistricting data to the States. 4 F.3d at 1377 n.6. The court distinguished the transmission of *redistricting data* to the States from the transmission of *apportionment data* to the President under 13 U.S.C. §141(b). The latter is not "final agency action" because "its effect on reapportionment is felt only after the President makes the necessary calculations and reports the result to the Congress." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). In contrast, *Detroit* implies, the release of the data to the States is felt immediately—there is no other federal actor that must sign off before the agency's action affects the States. *Detroit*, 4 F.3d at 1377 n.6. The defendants seem to think *Detroit* stands for the proposition that, because handing over redistricting numbers is final and thus challengeable, other actions are not. *See* Resp.20–21. *Detroit* does not say that: the "final agency action" it reviewed was *not* the handing over of the data, but rather the Secretary's refusal to adjust and re-report it. 4 F.3d at 1377–78. And it is a good thing *Detroit* did not say what the defendants think it said, because any such statement would be absurd. After all, many census-related actions short of sharing census data—for example, decisions regarding what will be included on the census form, *Dep't of Com.*, 139 S. Ct. 2551—are "final agency actions."

**Consequence.** The State of Ohio has a statutory right to receive redistrict-

ing data from the Secretary of Commerce by March 31, and the February 12 Decision denies the State that right. What is more, the Decision "binds agency staff and affected parties have no means (outside of judicial review) by which to challenge it." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019). It follows that the Decision is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes*, 136 S. Ct. at 1813 (quotation omitted). The defendants try to avoid this conclusion by insisting that the February 12 Decision was actually a mere reiteration that "the Secretary will deliver redistricting data to the States, including Ohio, when the data becomes available." Resp.21. That is not a fair description. The February 12 Decision announces, definitively, that the Secretary will not be complying with the March 31 deadline, and it announces a new schedule to replace the one set by Congress. The Decision thus confirms that the States will not receive the data before the date by which it is owed to them. The defendants do not deny the States are owed the data, though they say Ohio can get by without it. That has no bearing on whether the Decision denies Ohio its right to receive the data by March 31.

*Discrete agency action.* The APA permits challenges to "discrete" agency actions; it does not allow plaintiffs to seek relief based on generalized grievances about an agency's performance or policy approach. *NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 419 (D. Md. 2019). The defendants say that Ohio's lawsuit violates this principle. They characterize the suit as an attack on the entire operation of the 2020 Census, suggesting the State seeks this Court's "'hands-on' management

12

of the Census Bureau's operations." Resp.22 (citing *NAACP*, 945 F.3d at 191).

They are incorrect. Ohio is challenging *only* the February 12 Decision, which is to say, the Bureau's decision to delay the release of redistricting data beyond the March 31 deadline. Ohio does not ask this Court to tell the Bureau *how* to meet its deadline (or any deadline it may set by injunction). Nor does it ask the Court to micromanage (or even inquire about) the Bureau's internal operations. It simply wants an order enjoining one particular decision: the decision to illegally delay the release of Ohio's redistricting data past March 31 and through September 30. This tailored relief stands in sharp contrast to the relief sought in the *NAACP* case the defendants cite. The plaintiffs there challenged the 2020 Census Final Operational Plan, arguing that six design choices deprived them of their constitutional right to a fair and accurate census. 945 F.3d at 420–21. And instead of requesting specific improvements to the six alleged flaws, the plaintiffs sought an injunction requiring the Census Bureau to "propose and *implement, subject to this Court's approval and monitoring, a plan* to ensure that hard-to-count populations will be actually enumerated in the decennial census." *Id.* at 422 (emphasis added). While a suit like *that* would be improper, this case is not remotely similar.

### b. Ohio will prevail on the merits of its APA claim.

The APA requires that courts set aside administrative actions that are "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The defendants concede that "the Census Bureau's inability to deliver the redistricting data by March 31, 2021, is inconsistent with 13 U.S.C. §141(c)." Resp.22. It fol-

lows that the February 12 Decision is "not in accordance with law" and must be set aside. The defendants, apparently recognizing this, ask the Court not to enjoin the February 12 Decision, and to instead "remand" the matter "to the agency for additional investigation." Resp.23 (quotation omitted). The Court should decline that request. "When an agency legally errs by acting outside its statutory authority, a remand would be futile and improper." *Union Pac. R.R. v. Dep't of Homeland Sec.*, 738 F.3d 885, 900 (8th Cir. 2013). Because the February 12 Decision is contrary to law, this Court must set it aside.

Even if the delay were lawful, it would be "arbitrary" and "capricious." 5 U.S.C. §706(2)(A); Mem. in Support 17–19. Defendants have provided no basis to argue otherwise. It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Thus, courts must conduct arbitrary-and-capricious review based on "the administrative record that formed the basis for the agency's decision." *John Doe, Inc. v. DEA*, 484 F.3d 561, 570 (D.C. Cir. 2007). In the preliminary hearing with this Court, the government represented—as a means to avoid disclosing the administrative record—that it would not make arguments requiring access to the administrative record. Having made that representation, it cannot now defend against Ohio's arbitrary-and-capricious claims on the merits.

The defendants' merits arguments fail regardless. They try to support the February 12 Decision using declarations prepared for litigation *after* the February

14

12 Decision. But in arbitrary-and-capricious review, courts may consider "*only* contemporaneous explanations for agency action," not "belated justifications." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (emphasis added). So the defendants' evidence is legally irrelevant. It is inadequate, too. While two Bureau officials insist it is impossible to provide the data "by, or even close to, the statutory deadline of March 31, 2021," Whitehorne Decl. ¶12, other officials suggested the opposite when it was expedient to do so. *See above* 7–8. And in any event, the declarations give this Court no basis for doubting the defendants' ability to comply with an injunction requiring the release of redistricting data at some point after March 31 but before September 30—within three months of the apportionment figures' release, perhaps. *See above* 7.

### 2. This Court can enjoin the February 12 Decision under its inherent equitable authority if APA review is unavailable.

If the APA does not apply to this case, the Court can enjoin the February 12 Decision under its inherent equitable authority. The federal courts' power to enjoin illegal conduct "by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015). Courts may assert this inherent authority provided doing so neither contradicts validly enacted laws nor violates other principles of equity. *See id*. at 327–28.

The defendants respond, first, by insisting that the inherent power to enjoin equitable actions applies only in limited circumstances—circumstances the defendants never bother to identify. Resp.16. They next insist that Congress, by passing

15

the APA, implicitly forbade the courts from exercising this power against adminis-
trative actions. The APA, the defendants say, is the "express mechanism," and thus
the *only* mechanism, for challenging administrative action. Resp.17. The court
should reject that argument. For one thing, the defendants claim that the February
12 Decision is *not* a final agency action and so not subject to the APA. Resp.20–21.
Nothing in the APA suggests that Congress meant to foreclose aggrieved parties
from seeking relief from actions outside the APA's scope. This does not make "the
APA's limitations on judicial review … meaningless." Resp.17. Anyone who wants
to invalidate action on the ground that it violates the APA (because it is arbitrary
and capricious, for example), must make a claim under the APA. Those who seek to
challenge an action *outside* the APA's scope will prevail in winning an injunction
*only if* they prove that the action at issue is *ultra vires* or otherwise illegal.

The Court should reject the defendants' argument that Ohio cannot win an
injunction because "equitable jurisdiction is limited to relief that 'was traditionally
accorded by courts of equity.'" Resp.17 (quoting *Grupo Mexicano de Desarrollo S.A.
v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). The relief Ohio seeks *was* tradi-
tionally accorded by courts of equity. Again, the "ability to sue to enjoin unconstitu-
tional [or otherwise illegal] actions by state and federal officers is the creation of
courts of equity, and reflects a long history of judicial review of illegal executive ac-
tion, tracing back to England." *Armstrong*, 575 U.S. at 327. That is why Chief Jus-
tice Marshall, way back in 1824, could confidently write that a request to enjoin en-
forcement of an unconstitutional law was "cognizable in a Court of equity." *Osborn*

16

*v. President, Dirs. & Co. of Bank*, 9 Wheat. 738, 839, 845–46 (1824).

All of this is consistent with, not contrary to, the Supreme Court's issuance of a stay pending appeal in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (cited by Resp.17 n.2). The opinion in that case contains almost no reasoning. It says: "the Government has made a sufficient showing … that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005" of a recent bill. *Id.* That case, however, *did not* involve conduct outside the APA's scope: as the dissenting judge in the Ninth Circuit argued, presumably to the Supreme Court's satisfaction, the challenged action *could be* brought under the APA, just not by the plaintiffs in that case. *Sierra Club v. Trump*, 929 F.3d 670, 713–15 (9th Cir. 2019) (Smith, J., dissenting). Judge Smith further argued that courts may not exercise their inherent equitable authority to enjoin actions that *are* subject to challenge under the APA. *Id.* at 716. It is not clear whether the Supreme Court agreed—it never addressed the issue. Even if the Court had agreed, its agreement would be irrelevant here *if* this Court were to accept the defendants' argument that the February 12 Decision is *not* subject to an APA challenge at all. *Contra* Resp.18–19.

**B. Ohio satisfied the other factors for a preliminary injunction.**

Ohio satisfies the remaining factors for injunctive relief, too. The February 12 Decision will irreparably injure Ohio for the reasons already discussed in connection with standing. An injunction will be in the public interest, because it would require compliance with the law and permit Ohio to carry out its redistricting process in the constitutionally preferred manner. *See Coal. to Defend Affirmative Action v.*

*Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

The effects on third parties do not militate against relief. For one thing, even if other parties would be irreparably injured by an injunction, Ohio will be irreparably harmed *without* one. When "irreparable harm will befall one side or the other of the dispute no matter what," this factor is of little relevance. *Id.* (citation omitted). Regardless, an injunction will not seriously harm others. The defendants say they cannot accurately complete the process before March 31. That is doubtful, as already discussed. It is also irrelevant. Again, Ohio asked this Court, in the event it deems compliance with the March 31 deadline impossible, to enjoin the defendants from delaying "beyond a date this Court deems equitable and reasonable under all the circumstances." Mem. in Support 24. *The very latest* such date is three months after the release of the apportionment data, *see* 13 U.S.C. §141(b), (c), which would mean releasing the redistricting data at some point in July.

What is more, the Court could tailor its injunction to Ohio. The Bureau responds that, if the Court did this, the Bureau "may well have to delay delivery of other states' data until past September 30, 2021." Resp.26. As an initial matter, it is inconceivable why the Bureau cannot wrap up the redistricting data for all States within three months after the release of apportionment data. But also, not every State needs the data with the same urgency, as the defendants' own brief acknowledges. Resp.27. The Bureau can prioritize the States that need the data soonest. The defendants' insistence that the "better course" here is for Ohio to amend its constitution does not deserve to be taken seriously. Resp.27. Amending Ohio's con-

18

stitution between now and September is not a realistic possibility. And the fact that other States can adjust their schedules, Resp.27, is all the more reason to give Ohio's data preference. If the Census Bureau means to suggest that it would be harmed by *too many* injunctions, that is something for later courts to worry about if this Court enjoins the February 12 Decision as to Ohio.

*Amici curiae* urge the Court to refrain from issuing any injunction that would contradict a stipulation order entered by a district court in California. *Amici* Br.3. The risk of inconsistent orders is easily avoided. The stipulation says only that *apportionment* figures will not be released before April 16, *Amici* Br.11, while Ohio seeks the release of *redistricting* data on either March 31 or, at the latest, within three months of the apportionment figures' release. Regardless, the fear of inconsistency is misplaced. The cases *amici* cites are good reminders that federal courts should pause before wading into the jurisdiction of other federal courts. *Amici* Br.14. But the principle animating those cases—comity—forbids allowing a court-approved agreement between parties in California to bar *non*-parties, including sovereigns like the State of Ohio, from seeking relief for their own injuries in different courts. *Cf. Martin v. Wilks*, 490 U.S. 755, 768 (1989); *Buck v. Gordon*, 429 F. Supp. 3d 447, 468 (W.D. Mich. 2019). Indeed, allowing such agreements to have this broad effect would be dangerous, as it would empower the Executive Branch to effectively repeal laws it dislikes by entering into collusive agreements.

The *amici* additionally stress that this Court should not "'order the Secretary' to comply with a deadline without first finding that lawful compliance [is] indeed

possible.'" *Amici* Br.18 (quoting *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017)). And they insist that the importance of the deadlines does not permit the Court to ignore other relevant considerations. *Amici* Br.14. True enough. But Ohio does not ask the Court to ignore other concerns or demand the impossible. If the Court deems the March 31 date impossible to satisfy, it should order an injunction requiring that the data be handed over at some later date, sufficiently far in advance of September 1 so that the State can use it. Requiring an agency that could not meet a statutory deadline to instead abide by a court-imposed schedule was, after all, exactly what the D.C. Circuit did in one of the cases the *amici* trumpet. *See Env't Def. Fund v. EPA*, 852 F.2d 1316, 1331 (1988).

## III. The Court may award mandamus relief in the alternative.

In the alternative, the Court should issue a writ of mandamus. The defendants say mandamus would be improper because the March 31 deadline is merely discretionary, not mandatory. Resp.29. That contradicts, in addition to the statutory text, the defendants' concession that the delay "is inconsistent with 13 U.S.C. §141(c)." Resp.22. It also contradicts the "[h]istorical practice" the defendants invoke: the fact that Congress has extended statutory deadlines that the federal government would otherwise miss suggests that Congress views those deadlines as mandatory rather than discretionary. Resp.30 n.4.

## CONCLUSION

The Court should grant the State's request for relief.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Benjamin  M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  *Trial Attorney*
MAY DAVIS (*pro hac vice*)
Deputy Solicitor General
BRIDGET C. COONTZ (0072919)
Section Chief, Constitutional Offices
JULIE M. PFEIFFER (0069762)
30 East Broad Street, 17th Floor
6l4-466-8980
614-466-5087; fax
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2021 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS* (0095284)
Solicitor General
  **Trial Attorney*