**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

STATE OF OHIO,

                    Plaintiff,

       v.

GINA RAIMONDO, in her official capacity as
Secretary of Commerce, et al.,

                    Defendants.

No. 3:21-cv-00064-TMR

District Judge Thomas M. Rose

**<u>AMICUS CURIAE BRIEF FOR NATIONAL URBAN LEAGUE; LEAGUE OF WOMEN
VOTERS; BLACK ALLIANCE FOR JUST IMMIGRATION; KING COUNTY,
WASHINGTON; CITY OF SAN JOSE, CALIFORNIA; THE NAACP; THE NAVAJO
NATION; CITY OF LOS ANGELES; CITY OF SALINAS; CITY OF CHICAGO; AND
GILA RIVER INDIAN COMMUNITY</u>**

## INTRODUCTION AND INTEREST OF AMICI[1]

Amici are plaintiffs in *National Urban League v. Raimondo*, No. 5:20-cv-05799-LHK (N.D. Cal.), a long-running and heavily publicized suit challenging the previous administration's August 2020 decision to dramatically accelerate the timeline for the 2020 Census. That decision had shortened by many months the time the Census Bureau (the Bureau) had planned to devote to data-collection and data-processing efforts—plans the Bureau had meticulously designed over years of development and testing. Amici are local governments, tribal communities, and advocacy organizations representing "hard-to-count" populations, including communities of color, low-income individuals, undocumented immigrants, and persons with mental and physical disabilities. As the Bureau and courts have consistently recognized, hard-to-count communities are those most likely to suffer from a rushed census process that involves incomplete data collection and inadequate data processing.

After more than a month of highly expedited litigation, with dozens of filings, expert and fact declarations, and many hours of hearings, the United States District Court for the Northern District of California issued a 78-page decision preliminarily enjoining the Bureau from carrying out the expedited census schedule. *Nat'l Urb. League v. Ross* (*NUL I*), No. 20-cv-05799-LHK, 2020 WL 5739144, at *23 (N.D. Cal. Sept. 24, 2020), attached as Exhibit B, *order clarified*, 2020 WL 5876939 (N.D. Cal. Oct. 1, 2020). In its decision, the district court found that attempting to accomplish the 2020 Census in far less time than the Bureau had previously planned, in the midst of a once-in-a-century pandemic, would "likely undercount hard to count populations," injure the "crucial representational rights that depend on the census," and "deprive[] local government

---

[1] On March 12, 2021, counsel for amici sought consent from counsel for Plaintiff and Defendants for the filing of this amicus brief. Both parties indicated that they consented to the filing.

Plaintiffs of federal funds they are entitled to." *Id.* (citations omitted). After additional months of discovery and briefing—as well as litigation before the Ninth Circuit and the U.S. Supreme Court—the Bureau agreed in a stipulation and accompanying order approved and entered by the district court (the Stipulation Order) that it would take the time necessary to produce a complete and accurate census. Specifically, the Bureau agreed that it would not "under any circumstances report the results of the 2020 Census . . . **before April 16, 2021**." Stipulation & Order at 2, *National Urb. League v. Raimondo*, No. 5:20-cv-05799 (Feb. 3, 2021), Dkt. No. 467 (hereinafter "Stipulation Order") (emphasis added), attached as Exhibit C. Amici's interest in this case stems from the ongoing Northern District of California litigation and that Stipulation Order—both of which are intended to ensure that the Bureau has time to do the crucial and constitutionally significant work of producing accurate numbers for the 2020 Census.

Ohio's request that this Court order the Bureau to provide state redistricting data by **March 31, 2021** directly conflicts with the Stipulation Order. The Census Bureau cannot provide granular redistricting data to Ohio without first reporting the more general state-wide results of the census that are the subject of the Stipulation Order. Accordingly, a ruling by this Court forcing the Bureau to meet a March 31 deadline would require it to violate the Northern District of California's order. In the interest of inter-district comity, amici urge the Court not to impose such inconsistent obligations on the Government—particularly when doing so would cause grave harm to amici and many other governments, organizations, communities, and individuals across the United States. The Northern District of California has already given serious thought to the competing interests at issue in this case, including the interest of the states in meeting their own redistricting deadlines. This Court should decline to grant contradictory relief.

In urging the Court to do so, Ohio ignores the Northern District of California litigation (and the Stipulation Order) altogether. It points instead to the March 31 statutory deadline for reporting redistricting numbers. But courts "cannot responsibly mandate flat . . . deadlines when the [agency] demonstrates that additional time is necessary" to ensure a reasoned decision. *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 712 (D.C. Cir. 1974). The Bureau has more than demonstrated the need for such time here. Moreover, rushing apportionment and redistricting would lead the Bureau to violate *another* statutory (and constitutional) obligation—namely, its "duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568-69 (2019) (citation omitted); *see also Utah v. Evans*, 536 U.S. 452, 478 (2002) (noting "a strong constitutional interest in accuracy"). That is likely why, in the multiple instances when the Bureau has previously missed statutory deadlines, courts have never once ordered the Bureau to rush its task to completion—and Congress has subsequently extended the statutory deadlines. This Court need not and should not order the Bureau to comply with a statutory deadline where, as here, that order would severely diminish the accuracy of the 2020 Census.

## BACKGROUND

### A.    Factual Background

Conducting the decennial census is a massive undertaking. Accomplishing that task for a population exceeding 300 million requires years of careful planning, followed by many months of sustained work. To this end, the Bureau spent most of the last decade creating its plan for the 2020 Census. *NUL I*, 2020 WL 5739144, at *2 (describing the Bureau's consultations with outside experts and eight significant tests). That plan (the "2018 Operational Plan") was ultimately codified in a 200-page document, containing precise timelines for each and every operation. *See* 83 Fed. Reg. 26,643 (June 8, 2018).

4

Census operations consist of two basic phases: data collection and data processing. During the data-collection phase, the Bureau solicits self-responses to the census questionnaire and goes door-to-door to households that have not otherwise responded (known as "Non-Response Follow Up" or NRFU). *NUL I*, 2020 WL 5739144, at *1. After data collection, the Bureau must process the data from over 100 million households into usable information. These data-processing operations include transforming written responses into computer-readable code, removing redundant data, and detecting and fixing over- or under-counts among groups. The data-processing operations are further subdivided into two, sequential stages: apportionment and redistricting. At the apportionment stage, the Census Bureau processes data at the state level to determine the number of congressional representatives for each state. *See New York*, 139 S. Ct. at 2561. At the redistricting stage, the Bureau drills down deeper to produce census-block level data that states use to draw their own electoral districts. *See, e.g.*, *Redistricting Data Program Management*, U.S. Census Bureau (Dec. 31, 2019).[2] As the Census Bureau has explained, "post data collection processing is a particularly complex operation, and the steps of the operation must generally be performed consecutively." Albert E. Fontenot, Jr. Decl. ¶ 19, *Nat'l Urb. League v. Raimondo*, No. 5:20-cv-05799 (Sept. 22, 2020), Dkt. No. 196-1. Therefore, the Bureau cannot simply skip ahead in its data processing to complete redistricting before apportionment.

Consistent with prior censuses, the 2018 Operational Plan determined that the Bureau needed 20.5 weeks (March 12, 2020-July 31, 2020) for self-response, 11.5 weeks (May 13, 2020-July 31, 2020) for NRFU, 22 weeks (August 1, 2020-December 31, 2020) for apportionment, and 13 weeks for redistricting (January 1, 2021-March 31, 2021). *See NUL I*, 2020 WL 5739144, at

---

[2] https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html.

5

*2. The apportionment deadline of December 31, 2020, and the redistricting deadline of March 31, 2021, were designed to match those required by statute. *See* 13 U.S.C. § 141(b), (c).

In March, just as census season began, the COVID-19 pandemic hit and the Bureau was forced to change its plan. *See NUL I*, 2020 WL 5739144, at *2-4. Among the many new challenges, the Bureau was unable to hire and train enumerators, and households were, unsurprisingly, unwilling to answer their doors. *Id.* at *4. On March 18, 2020, the Bureau suspended all field operations. *Id.* at *2. Over the course of the next month, the Bureau consulted with experts and stakeholders and developed a new plan (the "COVID-19 Plan"), which it announced and began implementing on April 13, 2020. *Id.* at *4. The COVID-19 Plan retained the key design choices from the 2018 Operational Plan; it simply adjusted the timeline for operations, ensuring that each was given the same amount of time or more. *Id.* Specifically, the Bureau provided 33.5 weeks for self-response (March 12, 2020-October 31, 2020), 12 weeks for NRFU (August 11, 2020-October 31, 2020), 26 weeks for apportionment (November 1, 2020-April 30, 2021), and 13 weeks for redistricting (May 1, 2021-July 31, 2021). *Id.* Because the new schedule extended beyond the December 31 statutory deadline for reporting apportionment, and the March 31, 2021 statutory deadline for reporting redistricting, the Secretary and the Bureau jointly requested an extension from Congress. *Id.* The President agreed that additional time was essential, but did not think a statutory extension was required. *Id.* at *5 ("I don't know that you even have to ask [Congress]. This is called an act of God. . . . I think 120 days isn't nearly enough."). Over the next four months, the Government carried out the COVID-19 Plan, while senior Bureau officials repeatedly and "publicly stated that meeting the December 31, 2020 deadline would be impossible." *Id.*; *see id.* at *5-6 (collecting statements).

Then, on July 21, 2020, the President issued a memorandum declaring that it was the United States' policy to exclude undocumented immigrants from the congressional apportionment base. *Id.* at *6. Once the memorandum issued, there was suddenly a "push to complete NRFU asap." *Id.* (quoting Bureau official). Shortening the census timeline would have ensured that, regardless of the outcome of the November election, President Trump would have had the opportunity to implement the memorandum. Delaying reporting until April provided no assurance of that.

In response to this push, high-level Bureau officials reaffirmed that it would be impossible to complete a constitutionally sound census count by December 31, 2020. For example, on July 23, 2020, Associate Director Timothy Olson emphasized the "need to sound the alarm to realities on the ground," explaining that "it is ludicrous to think we can complete 100% of the nation's data collection earlier than 10/31 and any thinking person who would believe we can deliver apportionment by 12/31 has either a mental deficiency or a political motivation." *Id.* Similarly, Bureau Chief Kathleen Styles explained that "[s]hortening the time period to meet the original statutory deadlines for apportionment and redistricting data will result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated activity." *Id.* at *7; *see also* *id.* at *6-7 (other similar statements between July 23 and July 31).

Despite these warnings, on July 29, 2020, the Secretary directed the Bureau to present a plan to meet the statutory deadline of December 31, 2020. *Id.* at *9, *20. By August 3, 2020, the Bureau had thrown together a plan (the "Replan") to truncate both data collection and processing, which it presented to the Secretary. *See id.* at *9. At the same time, Bureau officials continued to sound the alarm that the accelerated plan would significantly compromise data quality and pose a grave and unacceptable risk to the accuracy and completeness of the census. *See id.* at *33-36. The Replan drastically cut the timelines for the 2020 Census, compressing self-response to 29

7

weeks (March 12, 2020-September 30, 2020) and NRFU to 7.5 weeks (August 11, 2020-September 30, 2020), while slicing the data-processing time for apportionment in half from 26 weeks to 13 (October 1, 2020-December 31, 2020). *Id.* at *8. The Replan did not set a timeline for redistricting. *See* Albert E. Fontenot, Jr. & Deborah M. Stempowski, *2020 Census Update*, U.S. Census Bureau, at 2 (Mar. 18, 2021) (stating that redistricting plan was "in [d]evelopment").[3] Despite repeated warnings about the Replan's harms to accuracy, the Secretary approved and announced the plan the same day. *NUL 1,* 2020 WL 5739144, at *7.

### B.      Procedural Background

Amici filed suit, challenging the Replan as a violation of the Administrative Procedure Act (APA) and the Enumeration Clause. *Id.* at *1. Amici argued that the Bureau's failure to consider the Replan's harms to accuracy, as well as the public's serious reliance interests in the COVID-19 Plan, rendered the Replan arbitrary and capricious. *Id.* at *29. Amici further contended that the decision to rush the census would result in a significant undercount of hard-to-count populations and a constitutionally inaccurate census. *Id.* at *15-18, 28.

After a month of expedited litigation, with scores of filings on both sides, the Northern District of California issued a 78-page preliminary injunction order preventing the Bureau from implementing the Replan. *See id.* at *1-48. The order repeatedly emphasized the concern, reflected in many of the Bureau's own statements, that hastening the process would result in an inaccurate and incomplete census. *See id.* at *29-36. Specifically, the district court held that amici were "likely to succeed on the merits of their APA arbitrary and capricious claim for five reasons: (1) Defendants failed to consider important aspects of the problem, including their constitutional

---

[3]    https://www2.census.gov/about/partners/cac/sac/meetings/2021-03/presentation-2020-census-operational-review.pdf.

and statutory obligations to produce an accurate census; (2) Defendants offered an explanation that runs counter to the evidence before them; (3) Defendants failed to consider alternatives; (4) Defendants failed to articulate a satisfactory explanation for the Replan; and (5) Defendants failed to consider reliance interests." *Id.* at *29. The district court recognized that the Census Act imposes a statutory deadline of December 31, 2020, for delivery of census apportionment numbers to the President, but emphasized that because "agencies must often fulfill statutory obligations apart from deadlines, case law is replete with agency actions that missed statutory deadlines but nevertheless survived judicial review," and in fact "single-mindedly sacrificing statutory objectives"—such as, here, conducting an accurate census—"can itself violate the APA." *Id.* at *40. Without addressing the Enumeration Clause claim, the court enjoined the Bureau from following the Replan's September 30 deadline for halting data collection and its December 31 deadline for submitting apportionment counts.

The Government sought an emergency administrative stay and a stay pending appeal in the Ninth Circuit. A divided panel denied the emergency administrative stay. *See Nat'l Urb. League v. Ross* (*NUL II*), 977 F.3d 698, 702 (9th Cir. 2020). A subsequent panel then unanimously granted in part and denied in part the stay pending appeal. *See Nat'l Urban League v. Ross* (*NUL III*), 977 F.3d 770 (9th Cir. 2020). The panel held that the Replan likely violated the APA, but granted a partial stay insofar as the court's order "enjoined the Defendants from *attempting* to meet the December 31" statutory deadline. *Id.* at 781 (emphasis added). Noting the Government's argument that "the Replan was necessary to meet the statutory deadline," the Ninth Circuit concluded that "the worthy aspiration to meet that deadline does not excuse the failure to address *at all* other relevant considerations," including accuracy, and "also does not excuse the failure to consider whether, given the timeline of congressional action laid out by the district court, the

statutory deadline could have been moved; whether the deadline might be retroactively adjusted, as was done in several earlier censuses; or whether the deadline might be equitably tolled due to the force majeure of the pandemic." *Id.* at 779. The Supreme Court subsequently stayed the injunction in full, without issuing a substantive opinion. *See Ross v. Nat'l Urban League* (*NUL IV*), 141 S. Ct. 18 (2020).

Although the injunction was ultimately stayed as to the December 31, 2020 apportionment deadline, it became increasingly clear over time that the Bureau simply could not meet that deadline in any event. Even before the stay, "the President, Department of Commerce officials, Bureau officials, and outside analysis from the Office of the Inspector General, the Census Scientific Advisory Committee, and the Government Accountability Office all stated unequivocally . . . that the Bureau would be unable to meet [the December 31 apportionment] deadline under any conditions." *NUL III*, 977 F.3d at 779. And indeed, the Bureau did not meet it. December 31 came and went, with the Bureau still working to resolve data-processing anomalies. By early January, the Bureau had pushed its anticipated release date back to mid-February, noting that newly uncovered data anomalies might require even more time to adequately process data. *See* Hr'g Tr. 27:12-21, 26:15-28:7, *Nat'l Urb. League v. Raimondo*, No. 5:20-cv-05799 (N.D. Cal. Jan. 4, 2021), Dkt. No. 434.

Beginning in late-January, amici and the Government began settlement negotiations with the shared goal of ensuring that the numbers reported for the 2020 Census would be fair and accurate. On February 3, 2021, the Government agreed—and the district court entered an order recognizing—that the Census Bureau would not "under any circumstances report the results of the 2020 Census to the Secretary of the Department of Commerce, the President, and Congress, before

April 16, 2021." Stipulation Order at 2. That order ensured that the Bureau would take the time necessary to conduct a fair and accurate census.

## ARGUMENT

**I.     THE COURT SHOULD NOT GRANT INJUNCTIVE RELIEF THAT WOULD CONFLICT WITH THE NORTHERN DISTRICT OF CALIFORNIA'S ORDER**

This Court should not grant injunctive relief that would conflict with a binding order of another district court. As the Sixth Circuit has explained, "[f]ederal courts of coordinate rank . . . owe each other comity in the sense of respecting each other's orders and avoiding hindering each other's proceedings." *Smith v. SEC*, 129 F.3d 356, 361 (6th Cir. 1997) (quoting Wright & Miller, Fed. Prac. & Proc. § 2942). This fundamental equitable principle weighs strongly against granting injunctive relief where, as here, that relief would necessarily impose obligations on Defendants that conflict with those imposed by other courts. *See, e.g.*, *Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015); *United States v. AMC Ent., Inc.*, 549 F.3d 760, 773 (9th Cir. 2008). Requiring the Census Bureau to provide state redistricting data by March 31 would force the Bureau to rush data-processing and report the census results before April 16, in direct violation of the Stipulation Order. And, as the Northern District of California court found, it would cause significant harm to amici and many other groups in the process. This Court should deny any relief that would impose inconsistent duties on the Government.

### A.     The Northern District of California Has Approved The Government's Stipulation That It "Will Not Under Any Circumstances" Report Apportionment Figures Before April 16, 2021

The Government has stipulated that "the Census Bureau will not under any circumstances report the results of the 2020 Census to the Secretary of the Department of Commerce, the President, and Congress, before April 16, 2021." Stipulation Order at 2. There is no dispute that the Government is bound by that promise. *See FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d

1032, 1038 (6th Cir. 1991) ("Stipulations voluntarily entered by the parties are binding[.]" (citation omitted)); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Under federal law, stipulations . . . are generally binding on the parties and the Court." (citation omitted)). There is also no dispute that any failure to adhere to that promise would violate a duly entered court order. Indeed, the district court repeatedly emphasized the importance of memorializing this commitment in a binding order. Hr'g Tr. 34:14-41:21, *Nat'l Urban League v. Ross*, No. 5:20-cv-05799 (N.D. Cal. Jan. 15, 2021), Dkt. No. 458. The binding nature is especially important because it formed the basis of the parties' agreement to stay litigation while settlement negotiations remain ongoing. *See* Stipulation Order; Stipulation & Order, *Nat'l Urb. League v. Raimondo*, No. 5:20-cv-05799 (Feb. 24, 2021), Dkt. No. 471 (extending the stay until March 19, 2021).

### B. Ohio's Request For Injunctive Relief By March 31 Irreconcilably Conflicts With The Stipulation Order

Ohio's request that this Court order the Census Bureau to release state redistricting files by March 31 irreconcilably conflicts with the Bureau's binding commitment to refrain from releasing state population numbers for apportionment before April 16. The Bureau must finalize and release the state-population counts used to apportion the U.S. House of Representatives *before* it can create redistricting files for the states. This is because the Bureau's apportionment data products form the basis for its redistricting data products, including the files that Ohio seeks to expedite. Before the Bureau can tell a state how many people live in each census block and what their demographic characteristics are (the redistricting data), it must first set how many residents there are in the state as a whole by assigning them to their unique addresses (the apportionment data).

The Bureau's operational plans for producing its data products are complex, but their underlying logic is simple: each step creates the foundation for the next. First apportionment, then redistricting. *See* John M. Abowd & Victoria Velkoff, *Update on Disclosure Avoidance and*

*Administrative Data* at 9-10, U.S. Census Bureau (Sept. 13, 2019)[4]; *see also* danah boyd, Balancing Data Utility and Confidentiality in the 2020 U.S. Census at 10, Data & Soc'y (Dec. 10, 2019).[5]

Only after the Bureau has ensured that everyone has been counted once, only once, and in the right state as part of the apportionment process, can it take the next step of assigning characteristics to each of those people for redistricting purposes. In order to help states draw the equipopulous legislative districts that the Constitution requires, *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964), the Bureau must identify where each person lives within the state down to the census-block level—the smallest unit of census geography. And to comply with the requirements of the federal Voting Rights Act, the Bureau must also identify, among other things, the race and ethnicity of each of those hundreds of millions of people. 52 U.S.C. § 10301. All this redistricting-related data analysis assumes set populations that the Bureau can locate geographically and describe. For that reason, the data work on apportionment—which is concerned only with ascertaining raw population counts at the state level by ensuring the right people are counted at the right addresses—*must* precede the data work on redistricting. The Bureau cannot simply leapfrog apportionment processing and start on redistricting.

An order requiring the Census Bureau to provide redistricting data by **March 31** would thus necessarily conflict with the Northern District of California's Stipulation Order precluding the Bureau from providing apportionment data before **April 16**.

---

[4] https://www2.census.gov/cac/sac/meetings/2019-09/update-disclosure-avoidance-administrative-data.pdf.

[5] https://datasociety.net/wp-content/uploads/2019/12/DS_Differential_Privacy_L.pdf.

## C.    The Court Should Not Subject The Bureau To Conflicting Judicial Orders

Basic principles of comity strongly counsel in favor of this Court staying its hand and refraining from granting any relief that would conflict with the order of the Northern District of California.  Numerous judicial decisions have recognized that a district court "should not grant relief that would cause substantial interference with the established judicial pronouncements of [its] sister [courts]."  *AMC Ent.*, 549 F.3d at 773; *Georgia-Pacific*, 781 F.3d at 715 ("Equity requires that injunctions be carefully tailored, especially where . . . questions of inter-circuit comity are involved."); *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986) ("Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders.").  As the Sixth Circuit has explained, although "automatic deference to the decision of another [court] is not required, . . . there may be strong reasons for deference when to decide otherwise would subject a party to inconsistent legal duties."  *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 579 n.7 (6th Cir. 2003); *see also Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) (explaining that "the case for the second court's not going into conflict with the first is particularly strong" when granting relief "would place the defendant under inconsistent legal duties").

Following these principles, district courts have repeatedly declined to grant relief where that relief "would force [the Government] to choose between disparate orders from 'courts of coordinate jurisdiction and equal rank.'"  *Religious Sisters of Mercy v. Azar*, No. 3:16-CV-00386, 2021 WL 191009, at *19 (D.N.D. Jan. 19, 2021) (citation omitted); *see California ex rel. Lockyer v. U.S. Dep't of Agric.*, 710 F. Supp. 2d 916, 924 (N.D. Cal. 2008) (granting partial stay of injunction "to further judicial comity"); *Fund For Animals v. Norton*, 323 F. Supp. 2d 7, 9 (D.D.C. 2004) (modifying injunction to relieve government agency from the "impossible position of having to satisfy two irreconcilable court orders").  This Court should follow its sister courts' lead and decline to grant conflicting injunctive relief here.

14

## II. THE STATUTORY DEADLINE DOES NOT JUSTIFY THE EXTRAORDINARY RELIEF OHIO SEEKS

Plaintiff acknowledges none of this.  It makes virtually no mention of the highly publicized litigation in the Northern District of California—let alone the Stipulation Order that expressly prohibits the Bureau from doing what it asks this Court to order.  Ohio instead rests its case on the fact that the Census Act "imposes mandatory deadlines."  Pls.' Mot. for Prelim. Inj. at 9, ECF No. 6.  Plaintiff's assertions that agencies have no choice but to comply with statutory deadlines at all costs cannot be squared with reality, with the Bureau's own actions, or with established judicial precedent.

Courts "cannot responsibly mandate flat . . . deadlines when the [agency] demonstrates that additional time is necessary" to ensure a reasoned decision.  *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 712 (D.C. Cir. 1974).  Indeed, as the Northern District of California recognized, "case law is replete with agency actions that missed statutory deadlines but nevertheless survived judicial review."  *NUL I*, 2020 WL 5739144, at *40 (collecting cases).  And contrary to Ohio's assertions, the Administrative Procedure Act does not require agencies to comply with statutory deadlines at the expense of other statutory and constitutional objectives; in fact, "single-mindedly sacrificing statutory objectives to meet a statutory or judicial deadline can *itself* violate the APA." *Id.* (emphasis added)*; see also id.* at *41 ("Agencies cannot and should not ignore their full range of legal obligations to prioritize meeting statutory deadlines at all costs.").  The Ninth Circuit, too, recognized that "the worthy aspiration to meet [the Census Act's] deadline does not excuse the failure to address *at all* other relevant considerations," such as accuracy, and indeed raised the possibility that "the [statutory] deadline might be equitably tolled due to the force majeure of the pandemic." *NUL III*, 977 F.3d at 779.  And agencies miss statutory deadlines for far less weighty reasons than the need to adequately perform the critically important and constitutionally mandated

work of a decennial census during a global pandemic. Although agencies should strive to meet statutory deadlines, that does not mean they are free to sacrifice all other statutory and constitutional goals to do so—much less that courts should so *order*.

In determining the consequences for non-compliance with statutory deadlines, the key question is whether Congress imposed a sanction for non-compliance, rather than simply speaking in mandatory "shall" language. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003); *Nielsen v. Preap*, 139 S. Ct. 954, 967 (2019) (plurality opinion). If "a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart*, 537 U.S. at 159 (citation omitted); *see also Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998) (missing statutory deadline for delivering report to Congress did not mean the Secretary lacked power to deliver the report at a later date).

Under the Census Act, not only did Congress not provide sanctions for any late census report (let alone one necessitated by serious accuracy concerns), on multiple occasions when comparable census deadlines were violated, Congress has retroactively extended them. The United States has missed statutorily imposed reporting deadlines for the census throughout history, including in 1810, 1820, 1830, and 1840. *See NUL I,* 2020 WL 5739144, at *42. In each instance, "only after the deadline had passed without the required transmission did Congress act by extending the statutory deadlines." *Id.*; *see also NUL III*, 977 F.3d at 779 (noting that "the deadline might be retroactively adjusted [by Congress], as was done in several earlier censuses"); Defs.' Opp. to Mot. for Prelim. Inj. at 27, ECF No. 11 (noting that comparable legislation is about to be introduced). More recent history provides similar examples. In the 1940 and 1950 Censuses, Congress provided only two weeks for the enumeration of large cities and thirty days for the

remainder of the count. *See* Pub. L. No. 71-13, § 6, 46 Stat. 21, 23 (1929). When those deadlines proved impossible to meet, enumeration continued. *See* Bureau of the Census, *The 1950 Censuses—How They Were Taken*, at 19 (1955)[6]; *17,000,000 Still Unlisted as Census Taking Lags*, N.Y. Times (Apr. 24, 1940).[7] Congress never extended the deadlines; the Bureau apparently decided that completing an adequate count was more important. Yet in none of those instances did courts seek to override the judgment of the Bureau as to whether the census could be conducted in time to meet statutory deadlines. This Court should not be the first to order the Bureau to sacrifice quality and accuracy in the name of hitting a statutory deadline. *See Carey v. Klutznick*, 637 F.2d 834, 837-38 (2d Cir. 1980) (holding, with respect to Census Act deadline, that there is "nothing sacred in the due date of the [census] filing, especially when the work of the Census Bureau, at least as preliminarily demonstrated below, is incomplete").

There are times when other agencies, too, have been unable to comply with deadlines set by Congress. *See, e.g., NUL I*, 2020 WL 5739144, at *40; Richard J. Lazarus, *The Tragedy of Distrust in the Implementation of Federal Environmental Law*, Law & Contemp. Probs., Autumn 1991, at 311, 323–28 (noting that "EPA has met only about 14 percent of the congressional deadlines imposed"). Yet courts have not ordered these agencies to comply no matter what. For example, in *Environmental Defense Fund v. Environmental Protection Agency*, "the D.C. Circuit set a 'court-imposed schedule' after the EPA violated statutory deadlines for studying and designating hazardous mining wastes. The D.C. Circuit set judicial deadlines that were years *after* the missed statutory deadlines." *NUL I*, 2020 WL 5739144, at *40 (quoting *Env't Def. Fund v.*

---

[6] http://www2.census.gov/prod2/decennial/documents/1950/proceduralHistory /1950proceduralhistory.zip

[7] https://timesmachine.nytimes.com/timesmachine/1940/04/24/92949988.html ?pageNumber=1 (behind paywall).

*EPA*, 852 F.2d 1316, 1331 (D.C. Cir. 1988)). The "D.C. Circuit's order thus allowed the EPA to continue violating the statutory deadlines so that the EPA could fulfill its other statutory duties." *Id.*

Moreover, as the D.C. Circuit has explained, it is "an abuse of discretion[] to . . . order the Secretary" to comply with a deadline "without first finding that lawful compliance [is] indeed possible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017). Where "'budgetary commitments and manpower' would render performance 'beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs,'" a judicial order requiring immediate compliance with deadlines is inappropriate. *Id.* at 167-68 (quoting *Train*, 510 F.2d at 712). Ordering the Bureau to produce redistricting data on the schedule that Plaintiff seeks—*i.e.*, by the end of this month—is effectively impossible. *See* Defs.' Opp. to Mot. for Prelim. Inj. at 8-9. And the ensuing harm to many states, local governments, non-profit organizations, businesses, and individuals who rely on accurate census data—including amici—is hard to overstate. The Bureau has not yet completed the necessary processing to produce fair and accurate statewide *apportionment* numbers—let alone the far more detailed and granular data needed to produce *redistricting* numbers. How could the Bureau possibly accomplish this task without introducing the same harms that the Northern District of California warned would result from slashing crucial census operations in the midst of a pandemic? *See, e.g.*, *NUL I*, 2020 WL 5739144, at *15-18, *45-47. Ohio does not say. This Court should not order the impossible merely to force compliance with the March 31 deadline.

Ohio's alternative request for relief at the "earliest possible date" (Compl. ¶ 61(c)) does not fare much better. Producing fair and accurate redistricting data in compliance with the Census Act and the Constitution takes time. Converting the apportionment files into redistricting files

requires massive amounts of time, labor, and expertise. The Bureau must assign demographic characteristics to all people in the country based on their census responses, fill in any missing demographic information using statistical imputation methods, and tabulate all that data down to the census-block level of geography, all the while resolving data errors and other unforeseen difficulties. *See* boyd, *supra*, at 11-12; 2020 Census Operational Plan at 133-34, U.S. Census Bureau (Dec. 2018).[8] The Bureau must then implement statutorily required, disclosure-avoidance technology to protect any and all census respondents from having their personal information exposed to the world. *See* 13 U.S.C. §§ 8, 9; *see also* 2020 Census Operational Plan, *supra*, at 140 (describing disclosure avoidance as a "key feature of the Census Bureau's confidentiality protection systems for decades"). The Bureau cannot simply churn out redistricting data the moment it finalizes apportionment—which, again, has not yet happened and cannot happen before April 16, 2021, per the Stipulation Order.

## CONCLUSION

For the foregoing reasons, this Court should deny Ohio's request for preliminary injunctive or mandamus relief.

Date: March 13, 2021

Respectfully submitted,

*/s/ Nancy A. Valentine*
Nancy A. Valentine (0069503), Trial Counsel
**MILLER, CANFIELD, PADDOCK AND STONE, PLC**
1100 Superior Avenue East, Suite 1750
Cleveland, Ohio 44114
Direct Telephone: (216) 716-5040
Telephone: (216) 716-5044
Facsimile: (216) 716-5043
E-mail: valentine@millercanfield.com

---

[8] https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan4.pdf.

19

Christina J. Marshall (0069963)
**MILLER CANFIELD PADDOCK AND
STONE, P.L.C.**
840 W. Long Lake Road, Suite 150
Troy, MI 48098
Telephone: (248) 267-3256
Facsimile: (248) 879-2001
marshall@millercanfield.com

*Co-Counsel for Amici National Urban League;
League of Women Voters; Black Alliance for
Just Immigration; King County, Washington;
City of San Jose, California; The NAACP; The
Navajo Nation; City of Los Angeles; City of
Salinas; City of Chicago; and Gila River Indian
Community*

Additional Counsel Not Admitted in the State of
Ohio or the Southern District of Ohio or *pro hac
vice:*

Sadik Huseny
sadik.huseny@lw.com
Steven M. Bauer
steven.bauer@lw.com
Amit Makker
amit.makker@lw.com
Shannon D. Lankenau
shannon.lankenau@lw.com
**LATHAM & WATKINS** LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

Melissa Arbus Sherry
melissa.sherry@lw.com
Richard P. Bress
rick.bress@lw.com
Anne W. Robinson
anne.robinson@lw.com
Tyce R. Walters
tyce.walters@lw.com
Gemma Donofrio
gemma.donofrio@lw.com
Christine C. Smith

christine.smith@lw.com
**LATHAM & WATKINS** LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

*Attorneys for Amici National Urban League;
League of Women Voters; Black Alliance for
Just Immigration; King County, Washington;
City of San Jose, California; and the NAACP*

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg
erosenberg@lawyerscommittee.org
Ajay Saini
asaini@lawyerscommitee.org
Maryum Jordan
mjordan@lawyerscommittee.org
Pooja Chaudhuri
pchaudhuri@lawyerscommittee.org
**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

*Attorneys for Amici National Urban League;
City of San Jose, California; League of Women
Voters; King County, Washington; Black
Alliance for Just Immigration; the NAACP; and
Navajo Nation*

Wendy R. Weiser
weiserw@brennan.law.nyu.edu
Thomas P. Wolf
wolft@brennan.law.nyu.edu
Kelly M. Percival
percivalk@brennan.law.nyu.edu
**BRENNAN CENTER FOR JUSTICE**
120 Broadway, Suite 1750
New York, NY 10271
Telephone: 646.292.8310
Facsimile: 212.463.7308

*Attorneys for Amici National Urban League;*
*City of San Jose, California; League of Women*
*Voters; King County, Washington; Black*
*Alliance for Just Immigration; the NAACP; and*
*Navajo Nation*

Mark Rosenbaum
mrosenbaum@publiccounsel.org
**PUBLIC COUNSEL**
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*Attorneys for Amicus City of San Jose*

Doreen McPaul, Attorney General
dmcpaul@nndoj.org
Jason Searle
jasearle@nndoj.org
**NAVAJO NATION DEPARTMENT OF**
**JUSTICE**
P.O. Box 2010
Window Rock, AZ 86515
Telephone: (928) 871-6345

*Attorneys for Amicus Navajo Nation*

Michael N. Feuer
mike.feuer@lacity.org
Kathleen Kenealy
kathleen.kenealy@lacity.org
Danielle Goldstein
danielle.goldstein@lacity.org
Michael Dundas
mike.dundas@lacity.org
**CITY ATTORNEY FOR THE CITY OF**
**LOS ANGELES**
200 N. Main Street, 8th Floor
Los Angeles, CA 90012
Telephone: 213.473.3231
Facsimile: 213.978.8312

*Attorneys for Amicus City of Los Angeles*

Christopher A. Callihan
legalwebmail@ci.salinas.ca.us
Michael Mutalipassi
michaelmu@ci.salinas.ca.us

**CITY OF SALINAS**
200 Lincoln Avenue
Salinas, CA 93901
Telephone: 831.758.7256
Facsimile: 831.758.7257

*Attorneys for Amicus City of Salinas*

Rafey S. Balabanian
rbalabanian@edelson.com
Lily E. Hough
lhough@edelson.com
**EDELSON P.C.**
123 Townsend Street, Suite 100
San Francisco, CA 94107
Telephone: 415.212.9300
Facsimile: 415.373.9435

Celia Meza, Acting Corporation Counsel
Rebecca Hirsch
rebecca.hirsch2@cityofchicago.org
Stephen J. Kane
Stephen.kane@cityofchicago.org
**CORPORATION COUNSEL FOR THE
CITY OF CHICAGO**
121 N. LaSalle Street, Room 600
Chicago, IL 60602
Telephone: (312) 744-8143
Facsimile: (312) 744-5185

*Attorneys for Amicus City of Chicago*

Donald R. Pongrace
dpongrace@akingump.com
Merrill C. Godfrey
mgodfrey@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD
LLP**
2001 K St., N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: 202-887-4288

*Attorneys for Amicus Gila River Indian
Community*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 15, 2021, a true and correct copy of the Amicus Curiae

Brief for *Amici National Urban League; League of Women Voters; Black Alliance for Just*

*Immigration; King County, Washington; City of San Jose, California; The NAACP; The Navajo*

*Nation; City of Los Angeles; City of Salinas; City of Chicago; and Gila River Indian Community*

was served through the electronic case filing system to all parties receiving notices in these

cases.

/s/ Nancy A. Valentine
Nancy A. Valentine (0069503)
*Co-Counsel for Amici National Urban
League; League of Women Voters; Black
Alliance for Just Immigration; King County,
Washington; City of San Jose, California; The
NAACP; The Navajo Nation; City of Los
Angeles; City of Salinas; City of Chicago; and
Gila River Indian Community*