UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**States of Ohio,**

      *Plaintiffs,*

v.　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:21-cv-064
　　　　　　　　　　　　　　　　　　　　　　　　　Judge Thomas M. Rose

**Gina Raimondo, in her official capacity as
Secretary of Commerce,[1]  et al.,**

      *Defendants.*

---

**ENTRY AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, ECF. 6, DISMISSING CASE FOR LACK OF JURISDICTION, AND TERMINATING CASE.**

---

Plaintiff the State of Ohio moves under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining Defendants from delivering redistricting data to all states as late as September 30, 2021 as Defendants announced would be the case in a February 12, 2021 Press Release, due to "COVID-19-related delays" and because "prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021." *Census Bureau Statement on Redistricting Data Timeline*, U.S. Census Bureau (Feb. 12, 2021), available at https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html. ECF 6, PageID 30. Ohio alternatively

---

[1] Gina Raimondo was recently confirmed as the Secretary of Commerce and has been substituted for Wynn Coggins, the former Acting Secretary of Commerce, under Federal Rule of Civil Procedure 25(d).

1

petitions under 28 U.S.C. §1361 for a writ of mandamus ordering the United States Secretary of Commerce to provide the State with redistricting data by March 31, 2021. ECF 6, PageID 31.

**I.      Background**

In order to apportion Members of the House of Representatives among the States, the Constitution requires an "actual Enumeration" of the population every 10 years, to be made "in such Manner" as Congress "shall by Law direct." U.S. Const. art. I, § 2, cl. 3; amend. XIV § 2. But the "population count derived from the census" goes beyond apportioning representatives; it is also used "to allocate federal funds to the States and to draw electoral districts." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019) (citation omitted). Thus, the decennial census has been described as "one of the most critical constitutional functions our Federal Government performs." *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act*, 1998, Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997) ("1998 Appropriations Act"). To ensure the census's integrity, "[t]he Framers assigned the task of enumeration to the federal government to make the apportionment count as objective as possible and to avoid the possibility of corruption by state politics." *NAACP v. Bureau of Census*, 382 F. Supp. 3d 349, 357 (D. Md. 2019) (citation omitted). Within the federal government, Congress has "virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting U.S. Const. art. I, § 2, cl. 3). Through the Census Act, Congress has largely delegated its census authority to the Secretary of Commerce, who is assisted by the Census Bureau. Id.; 13 U.S.C. § 141(a); 13 U.S.C. §§ 2, 4.

As Congress has recognized, "the decennial enumeration of the population is a complex and vast undertaking." 1998 Appropriations Act, § 209(a)(8), 111 Stat. at 2481 (1997). The 2020

Census was the culmination of an estimated $15.6 billion and over a decade of "planning, research, design, development, and execution" by thousands of Census Bureau employees to count approximately 330 million people across 3.8 million square miles. Thieme Decl. ¶¶ 4–5. This "massive undertaking" consisted of "35 operations using 52 separate systems" and a "master schedule, which has over 27,000 separate lines of census activities." Id. ¶ 4. Even before the statutory census day of April 1, 2020, the Census Bureau used satellite imagery and in-person inspections to establish a Master Address File containing every address in the country. Id. ¶¶ 8–11; 13 U.S.C. § 141(a). As census day drew near, households across the nation received an invitation by mail to complete the census, accompanied by a massive 700-million-dollar campaign to encourage participation in the constitutional survey. Id. ¶¶ 12–18. If a household did not respond online, by phone, or by mail, the Census Bureau sent up to five additional mailings. Id. ¶ 16. If a household still did not respond—as occurred for about 33% of the population—the Census Bureau attempted to enumerate them in person. Id. ¶¶ 18–28.

But the COVID-19 pandemic intervened. While the original plan was for the Census Bureau to begin in-person operations (called Nonresponse Followup) in May 2020, it was forced to suspend those operations for months. Id. ¶ 30. By the time the Census Bureau entered the field in earnest three months later, it did so during a confluence of natural disasters and civil unrest. Id. ¶ 33. "Devastating hurricanes in the Gulf Coast area . . . limited and slowed the Census Bureau's ability to conduct [Nonresponse Followup] operations." Id. In "large areas of the West Coast, field operations were hampered by conflagrations that caused health alerts due to fire and smoke." Id. Simultaneously, civil unrest in cities across the country made the already-difficult enumeration even harder. Id.

3

The Secretary and the Census Bureau were under a statutory directive to report the census results to the President by December 31, 2020 so that he could timely submit them to Congress for reapportionment of the House. See 13 U.S.C. § 141(b); 2 U.S.C. § 2a. Although the Executive had asked for an extension of the pertinent statutory deadlines, Congress did not oblige. Id. ¶ 34. So, the Census Bureau again adjusted its operations in an attempt to meet the statutory deadlines. Id. ¶ 35. But that adjustment led to judicial intervention. After a court-ordered preliminary injunction forced the Census Bureau to remain in the field, an emergency Supreme Court ruling stayed that injunction and allowed the Census Bureau to conclude field operations in mid-October 2020, having resolved 99.9% of all housing units in the process. See *Ross v. Nat'l Urb. League*, 141 S. Ct. 18 (2020); Thieme Decl. ¶ 35.

But once the Census Bureau has collected responses it must then "summarize the individual and household data that [it] collect[ed] into usable, high-quality tabulations." Thieme Decl. ¶ 36. To accomplish this, the Census Bureau must integrate data from different enumeration methods used across the country, identify any issues or inconsistencies that arise, rectify them, and produce tabulations that will guide the country for the ten years, all without compromising its statutory mandate to maintain the confidentiality of census responses. 13 U.S.C. § 9; Thieme Decl. ¶¶ 56-62 (describing how administrative records are incorporated and data is reconciled to produce the Census Unedited File); id. ¶¶ 63-67 (describing how the federally affiliated overseas population is incorporated into the data to produce apportionment numbers); id. ¶¶ 68-72 (describing the iterative process for compiling detailed information such as race, ethnicity, and age to produce the Census Edited File); id. ¶¶ 74-77 (describing the process for applying the Census Bureau's data privacy protection method); id. ¶¶ 78-81 (describing the process for generating usable data files).

Even using "computer processing systems" with "the latest hardware, database, and processing technology available," and working "with all possible dispatch," the Census Bureau was not able to meet its December 31, 2020 statutory deadline for reporting apportionment numbers. Thieme Decl. ¶ 37. Due to the difficulties encountered during data collection and issues that arose during the processing phase, the Census Bureau projects that it will not complete apportionment counts until April 30, 2021. Id.¶ 40. The Northern District of California has determined that "the Census Bureau will not under any circumstances report the results of the 2020 Census . . . before April 16, 2021." *Nat'l Urb. League v. Raimondo*, No. 20-cv-05799, ECF No. 465 & 467 (N.D. Cal. Feb. 3, 2020).

The delay in apportionment means the Secretary and the Census Bureau will miss the March 31, 2021statutory deadline to submit census-based redistricting data to the States. 13 U.S.C. § 141(c); Thieme Decl. ¶¶ 40–41. This was announced in a February 12, 2021 Press Release where the Census Bureau explained that "it will deliver the [ ] redistricting data to all states by Sept. 30, 2021" because "COVID-19-related delays and prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021." Census Bureau Statement on Redistricting Data Timeline, U.S. Census Bureau (Feb. 12, 2021).

The Census Bureau made the announcement for the benefit of States that use census-based redistricting data to draw their congressional or state election districts. While no federal law requires the use of census data for this purpose, the data is generally utilized by the states and also by the Department of Justice, when enforcing the Voting Rights Act. Whitehorne Decl. ¶ 4. That's why States generally use census data for redistricting.

5

Twenty-seven states are bound by their own laws to redistrict in 2021. See 2020 Census Delays and the Impact on Redistricting, National Conference of State Legislatures (last visited March 16, 2021), available at https://www.ncsl.org/research/redistricting/2020-census-delays-and-the-impact-on-redistricting-637261879.aspx. That has led some States under self-imposed redistricting pressure to find other solutions. In New Jersey voters approved a constitutional amendment that allowed the State to use previous district maps until the new maps are in effect for the 2023 elections. See Whitehorne Decl. ¶¶ 7–8; N.J. Const. art. III, § 3, ¶ 4; 2020 Census Delays and the Impact on Redistricting, National Conference of State Legislatures (*infra*). In California, the state legislature sought and obtained at least a four-month delay of the redistricting deadlines from the California Supreme Court. *Legislature of the State of Cal. v. Padilla*, 469 P.3d 405, 413 (Cal. 2020); Whitehorne Decl. ¶¶ 7–8. These States gathered information from the Census Bureau and found a way to remedy their own redistricting issues. Whitehorne Decl. ¶¶ 7–8.

On May 8, 2018, the People of Ohio approved a state constitutional amendment reforming the redistricting process so as to require significant bipartisan support for new congressional districting maps. This followed on the heels of an earlier, 2015 amendment that had already modified the process by which maps are drawn. Ohioans will get their first chance the see the new redistricting process in action in 2021, when the State draws new maps in response to the 2020 Census.

Today, the Ohio Constitution creates two redistricting processes, one for the drawing of state legislative districts and another for drawing congressional districts. The process for drawing state legislative districts is set out in Article XI of Ohio's Constitution. That Article creates a bipartisan, seven-member Ohio Redistricting Commission, which the Constitution vests with the

6

power to draw state legislative maps. Id., §1(A). The Commission may approve a map only if the map receives the "affirmative vote of four members of the commission, including at least two members of the commission who represent each of the two largest political parties represented in the general assembly." Id., §1(B)(3). The group must reach agreement no later than "the first day of September of a year ending in the numeral one." Id., §1(C). Before doing so, the Commission "shall conduct a minimum of three public hearings across the state to present the proposed plan and shall seek public input." Id.

The Constitution prescribes a different method for the drawing of congressional districts. See id., art. XIX, §1. The Ohio General Assembly has until "the last day of September of a year ending in the numeral one" to adopt a congressional map. Id., §1(A). Before that date, it must secure "the affirmative vote of three-fifths of the members of each house of the general assembly, including the affirmative vote of at least one-half of the members of each of the two largest political parties represented in that house." Id. If the General Assembly fails to meet that deadline, then the Ohio Redistricting Commission "shall adopt a congressional district plan not later than the last day of October of that year." Id., §1(B). It can do so only with "the affirmative vote of four members of the commission, including at least two members of the commission" representing the "two largest political parties represented in the general assembly." Id., §1(B). If the Commission is unable to reach an agreement, then the General Assembly may adopt a plan by the end of November. This time, the plan must win the "affirmative vote of three-fifths of the members of each house, including the affirmative vote of at least one-third of the members of" the two largest parties. Id., §1(C)(2). Finally, and as a fourth option, if all other options fail, the General Assembly may adopt a plan by the vote of a simple majority of members of each house. Id., §1(C)(3). To

deter the legislature from relying on this fourth option, the Constitution specifies that any plans adopted through this option expire after "two general elections for the United States house of representatives." Id.

Both the Commission and the General Assembly are required to determine population using data from "the federal decennial census." Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2). If and only if that data "is unavailable," the Commission and the General Assembly may determine population on another "basis" selected by the General Assembly. Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2).

Ohio's redistricting process is heavily influenced by two principles of federal law. First, States must draw congressional districts equal in number to the number of seats they are apportioned based on their populations. See U.S. Const., art. I, §2, cl.3. Second, the one-person–one-vote principle requires States to draw legislative districts that are roughly equivalent in population. See *Evenwel v. Abbott*, 136 S. Ct. 1120, 1123–24 (2016). To abide by these principles, the States rely on data provided through the census. That is the data by which total population (and so congressional apportionment) is decided. And that is the data that States use to ensure their districts are sufficiently equal in population.

The Census Act, 13 U.S.C. §1 *et seq*., ensures the provision of this data. The Act says that the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the 'decennial census date.'" 13 U.S.C. §141(a). "The Secretary is aided in that task by the Census Bureau, a statistical agency housed within the Department of Commerce." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019).

One of the Secretary's census-related duties is codified at 13 U.S.C. §141(c). That section speaks to the Secretary's responsibility for providing the States with "tabulations of population" useful for drawing legislative districts. Id. It says that the Secretary "shall" complete those tabulations "as expeditiously as possible after the decennial census date." Id. At the very latest, however, "tabulations of population of each State … shall … be completed, reported, and transmitted to each respective State within one year after the decennial census date." Id. Because federal law defines the "decennial census date" as April 1, see §141(a), the Secretary complies with her obligation to provide the information "within one year after the decennial census date" if she gives it to the States no later than March 31.

Congress has not extended the deadline. Nonetheless, the Census Bureau has announced it is unable to comply with the March deadline.

On February 25, 2021, the State of Ohio filed this suit in the Southern District of Ohio. The complaint alleges that the Secretary will violate the Census Act, and in particular 13 U.S.C. §141(c), if he fails to release the data before March 31, 2021. The complaint additionally alleges that the Defendants issued its February 12, 2021 press release in violation of the Administrative Procedure Act. See generally Compl. ¶¶ 1–61, ECF 1. Ohio seeks injunctive relief or a mandamus. ECF 6. Defendants oppose that motion. ECF 11. Ohio has replied, ECF 15, and the parties agree that the motion is ripe for adjudication. ECF 19, 22.

**II.** **Jurisdiction**

Federal courts must determine that they have jurisdiction of a case before proceeding to the merits. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One

9

component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Id., at 573–574. See also *Lance v. Coffman*, 549 U.S. 437, 439–40 (2007).

"The Supreme Court has enumerated the following elements necessary to establish standing: First, [the] [p]laintiff must have suffered an injury in fact–an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). *Glennborough Homeowners Ass'n v. United States Postal Serv.*, No. 20-12526, 2021 WL 858730, at *2 (E.D. Mich. Mar. 8, 2021)

"Because redressability is an "'irreducible'" component of standing, no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." *Uzuegbunam v. Preczewski*, No. 19-968, 2021 WL 850106, at *3–6 (U.S. Mar. 8, 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). An injury is redressable only "if a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d

842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). But a judicial decree is only the means to an end: "At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces." Id. (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). In other words, "[r]edress is sought through the court, but from the defendant," and "[t]he real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff." Id. (quoting *Hewitt*, 482 U.S. at 761).

Ohio seeks an advisory opinion that cannot redress their claimed injury. See *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015) (explaining that "the relief the plaintiff is seeking must provide redress for the injury"); *Brown v. Berhndt*, 12-cv-24- KGB, 2013 WL 1497784, at *5 (E.D. Ark. Apr. 10, 2013) (no standing where "injunctive relief [wa]s impossible"). That's because it is now impossible for the Census Bureau to meet the March 31 statutory deadline for providing census-based redistricting data. As the Census Bureau's head of redistricting explains, "producing redistricting data by, or even close to, the statutory deadline of March 31, 2021 is not possible under any scenario, and the Census Bureau would be unable to comply with any such order from the Court." Whitehorne Decl. ¶ 12. "[T]he Census Bureau must complete a series of interim steps prior to delivering the redistricting data," and "[e]ach of these interim steps, in order, is required to move to the next." Id. ¶¶ 13–14. Those steps will likely not be completed until September 30, 2021. Id. ¶¶ 14–15.

The injury Ohio claims is also unredressable when it comes to redistricting for congressional (as opposed to state) elections. In order to draw congressional districts, Ohio must

11

first know the number of Representatives it will have in Congress to know how many districts to draw. 2 U.S.C. § 2c. But the Census Bureau will not finish, and neither the Secretary nor the President will be able to report, the apportionment of Representatives until sometime after the March 31 deadline for redistricting data. See Thieme Decl. ¶¶ 40–41. And, at that point, apportionment will be entirely in Congress's hands to accept or reject. See 2 U.S.C. § 2a(b) (commanding that apportionment only occurs "under [2 U.S.C. § 2a] or subsequent statute"). So even if the relief Ohio seeks (redistricting data by March 31) was granted, Ohio would be no closer to drawing congressional districts on April 1.

In such circumstances, redressability (and standing) are lacking. See *Leifert v. Strach*, 404 F. Supp. 3d 973, 982 (M.D.N.C. 2019) (no redressability where "[i]t is not merely speculative, but rather impossible, for the requested relief to remedy the alleged injury"); *Vaduva v. City of Xenia*, 2018 WL 4207100, at *4 (S.D. Ohio Sept. 4, 2018) (Rose, J.) (finding a lack of redressability where plaintiff's requested relief "would be of no consequence"), aff'd 780 F. App'x 331 (6th Cir. 2019). Ohio seeks the impossible and "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167–68 (D.C. Cir. 2017). Indeed, "[i]t has long been settled that a federal court has no authority . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). The Court will therefore reject Ohio's request for an order that pretends that the Census Bureau could provide census-based redistricting data by March 31, 2021. The Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 167–68; Whithorne Decl. ¶ 12 (explaining that "it would be a physical impossibility" to provide redistricting data by March 31).

Ohio also lacks standing because it has not established injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An injury need not be tangible to be concrete: "intangible injuries premised on statutory violations in some instances may satisfy Article III's injury-in-fact requirement." *Huff*, 923 F.3d at 464. But bare assertion of "a statutory violation in and of itself is insufficient." *Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017). A litigant is not concretely injured and "standing is not met simply because a statute creates a legal obligation" that goes unfulfilled. Id. at 859-60 (collecting cases). To the contrary, "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct., at 1549; see also *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing"). And that "concrete injury" must be "plausibly and clearly allege[d]." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620–21 (2020).

Ohio has alleged a statutory violation in that the Census Bureau's plan to deliver redistricting data by September 30, 2021 is contrary to the deadlines established in 13 U.S.C. § 141(c). Compl. ¶¶ 1-2. However, the State does not actually need the Census Bureau's data to redistrict. Id. ¶¶ 2, 31. The Ohio Constitution contemplates ways in which redistricting can be accomplished in the absence of census data. See Ohio Const., art. XI, §3(A); art. XIX, §2(A)(2). Indeed, the Ohio Constitution explicitly provides that redistricting shall be based on "the federal decennial census or, if the federal decennial census is unavailable, another basis as directed by the general assembly." Ohio Const., art. XIX, § 2(A)(2) (congressional redistricting) (emphasis

13

added); art. XI, §3(A) (state redistricting provision, using similar language); see also art. XIX, §§1(D), (E) (providing that "congressional district plan adopted under this division shall be drawn using the federal decennial census data or other data on which the previous redistricting was based" (emphasis added)). None of the elaborate procedures or timelines that the Ohio constitution prescribes for redistricting are affected by the data source that is chosen. See generally Ohio Const., art. XIX, §§ 1-3 (congressional redistricting); art. XI, §§ 1-8 (state redistricting); see also Compl. ¶¶ 26–31 (describing the process). The "bipartisan, transparent redistricting process," Compl. ¶ 26, that Ohio's voters selected proceeds regardless of which data source is used.

The absence of census data thus does not stop the state from implementing its constitutional scheme or otherwise impinge on its sovereign interests in effectuating its law. See Compl. ¶ 37; PI Mot. at 20-21. No law is being frustrated or rendered invalid by the delay in census data. C.f. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Nor is there any imposition on Ohio's ability or power "to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). To the contrary, Ohio will be able to follow its state constitutional procedures and conduct its redistricting regardless of when the Census Bureau delivers its data because the state constitution explicitly contemplates that census data might be "unavailable"—and provides a mechanism for that contingency. Ohio Const., art. XIX, § 2(A)(2).

Ohio contends that the use of census data is "preferred," and that a delay of that data will leave the state no other choice but to use "alternative data sources" that are "a second-best option," Compl. ¶¶ 2, 35. But Ohio has made no allegations along these lines. The State does not allege that census data is superior to any available alternatives; nor does it contend that the use of census

14

data will result in better districts or enable it to better comply with federal law. See Compl. ¶¶ 1-2, 38; PI Mot. at 22. This is fatal. *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 312 (6th Cir. 2009) (because plaintiff "is the master of the complaint," he must "take responsibility for the allegations included in the complaint"). Alleging a preference untethered from real-world effects is insufficient. See, e.g., *Lujan*, 504 U.S. at 566 ("Standing is not an ingenious academic exercise in the conceivable," but rather requires "a factual showing of perceptible harm" (internal quotes and citation omitted)). To satisfy the injury-in-fact requirement, Ohio must connect the frustration of its purported preference to some "concrete harm[.]" *Spokeo*, 136 S. Ct. at 1549.

Ohio alleges that the use of non-census data will precipitate "high-stakes debates regarding which data to use and . . . fan[]partisan flames when one data source is eventually chosen, no matter how precise and reliable." Compl. ¶¶ 38, 39. Ohio also suggests that "debates over which data to use are sure to sow distrust in the entire redistricting process." PI Mot. at 22. These allegations fall short of concrete injury. For one thing, predicting what debates will transpire—and what those debates might sow—is speculative. An alleged future injury must be "certainly impending" and cannot rely on a "highly attenuated chain of possibilities"; "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) and *Lujan*, 504 U.S. at 565 n.2); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101– 02 (1983) ("[I]njury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" (citations omitted)).

Ohio's claim that Defendant's announcement that providing accurate numbers will take more time "will undermine the public's confidence in Ohio's redistricting process," ECF 15, PageID 259, beggars belief. Accuracy would seem to be the foundation of confidence, and Ohio's

15

redistricting plan foresees the possibility of delays in providing numbers. It would seem that the remedy Ohio seeks is more likely to reduce public confidence.

Ohio claims a purely procedural injury—i.e. the frustration of its expectation that the Census Bureau will follow the timelines prescribed in 13 U.S.C. § 141(c). See Compl. ¶¶ 32, 33, 34. Mere procedural injuries insufficient for Article III standing. See, e.g., *Huff*, 923 F.3d at 465–66 (finding no standing where plaintiff could not establish negative consequence from statutory violation); *Lyshe*, 854 F.3d at 860 ("[S]tanding is not met simply because a statute creates a legal obligation and allows a private right of action for failing to fulfil this obligation."). "[A]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (citing *Frank v. Autovest*, LLC, 961 F.3d 1185, 1188-89 (D.C. Cir. 2020); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 338 (7th Cir. 2019); *Huff*, 923 F.3d at 467; *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 346–47 (4th Cir. 2017)). The same is true here because the Census Act does not provide a cause of action to enforce the statutory deadline for redistricting data, meaning that Ohio can't rely on a congressional definition of "injuries and . . . chains of causation" to carry part of its burden. *Spokeo*, 136 S. Ct. at 1549 (internal quotes and citation omitted); see generally *Dreher*, 856 F.3d at 346 ("[I]t would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury.")

Ohio fails to establish an injury traceable to the decried conduct. "Redistricting is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and "involves choices about the nature of representation with which [courts] have been shown no constitutionally founded reason to interfere," *Burns v. Richardson*, 384 U.S. 73, 92 (1966). While

16

the use of census data is the general practice, no stricture of the federal government requires States to use decennial census data in redistricting, so long as the redistricting complies with the Constitution and the Voting Right Act. See id. at 91 ("[T]he Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured."); e.g., *Burns*, 384 U.S. at 92–97 (State may draw districts based on voter-registration data). So any injury Ohio may suffer is "fairly . . . trace[able]" to Ohio's independent decision to create a state redistricting timeline without the flexibility to accommodate the COVID-19 pandemic that has resulted in the unique challenges in completing the census this year (as well as any decision to use census data under such circumstances), not "the challenged action of the defendant." *Lujan*, 504 U.S. at 560.

Ohio has not established that it cannot accomplish its redistricting in the time that remains between the unavoidably delayed results of the 2020 Census and its 2022 elections. The Census Bureau intends to release the decennial redistricting data for the entire country by the end of September 2021. Ohio may well be able to redraw its districts by the time of its legislative and congressional primary and general elections in 2022 using census data released in September. The fact that the census data is not available to Ohio on the schedule it prefers, does not harm the State if it can still redistrict by the time of its next elections. If Ohio cannot meet the schedule for redistricting using the census data once it is released, there are alternatives it can pursue until the State can enact a plan.

Ohio also takes the position that Defendant's "assertions of impossibility are not credible" ECF 15, PageID 261, because they are "constantly evolving." Id., PageID 262. The Court notes the uncontested evidence that the Census Bureau made its notification within its regular course of

business. ECF 11-2, PageID 147-50. Ohio "may only rebut the presumption of regularity by clear evidence." *Paracha v. Trump*, No. CV 04-2022, 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019). As the *Paracha* panel explained:

> This threshold has long been the corollary to the presumption of regularity. See *United States v. Chem. Found. Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (observing that "clear evidence is usually required to displace the presumption" of regularity).

Id.; see also *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1684 (2019). Ohio has not alleged any facts that would overcome this presumption. All that is alleged is a context of ongoing developments in which Defendant is striving to fulfill is statutory obligations.

Here, Plaintiff wants for both standing and redressability. "The only injury plaintiffs allege is that the law…has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Because Ohio has not proven any concrete, cognizable harm that is traceable to the Census Bureau's actions, the State has failed to establish that "a federal court [should have] business entertaining [its] lawsuit." *Huff*, 923 F.3d at 465.

### III. Conclusion

Because Plaintiff lacks standing to bring an action, this Court lacks jurisdiction over the questions presented and need not opine on whether a press release violates the Administrative Procedure Act or the Census Act. Thus, Plaintiffs' Motion for Preliminary Injunction and Mandamus, ECF 6, is **DENIED**. The instant action is **DISMISSED** and the case is

18

**TERMINATED** on the docket of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

    **DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, March 24, 2021.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
